IN THE UNTIED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF MICHIGAN

NORTHERN DIVISION

MICHELLE MARIE LEFEBRE,                           Case No. _____
PERSONAL REPRESENTATIVE OF THE
ESTATE OF SHELLSEA BLAIR LEFEBRE-SCHIEL,

       Plaintiff,

                                     **COMPLAINT AND**
                                     **DEMAND FOR JURY**
     -vs-                             **TRIAL**

REMINGTON ARMS COMPANY, LLC.

       Defendant.

_____/

**Attorney for Plaintiff**

Leonard A. Siudara (P20542)
Leonard A. Siudara PC
5865 Andover Ct, Troy, MI 48098
(T) 248-417-7300
(F) 248-641-8141
(E) budatlaw@msn.com

COMPLAINT

1. Now Comes Plaintiff, Michelle Marie Lefebre by and through counsel, and for her

   Complaint for relief against Defendant, Remington Arms Company, LLC, states and

   alleges as follows:

1

## PARTIES

2.  Plaintiff Michelle Marie Lefebre, is a resident of Chippewa County, citizen of the State of Michigan, and duly appointed personal representative of the Estate of Shellsea Blair Lefebre-Schiel acting pursuant Letters of Authority issued on September 24, 2015 by Chippewa County Probate Court, (Case No. 15-27147-DE).

3.  Defendant Remington Arms Company, LLC (Remington) is a Delaware Corporation with its principal place of business at 870 Remington Drive, Madison, North Carolina 27025.

## JURISDICTION AND VENUE

4.  This Court has subject jurisdiction over this matter pursuant to 28 U.S.C. §1332 in that Plaintiff is a citizen of the State of Michigan, Defendant is a corporate citizen of the State of Delaware, and the amount in controversy exceeds Seventy-Five Thousand ($75,000.00) Dollars, exclusive of interest and costs.

5.  This Court has personal jurisdiction over Defendant as Remington manufactured and sold a defective and dangerous Model 700 bolt action hunting rifle (rifle) chambered for a Win 270 cartridge bearing serial # G6850107. The rifle was purchased new by Jose' Lefebre (Jose') in 2011 at a Bass Pro Shop in Mackinaw City, MI. The Bass Pro Shop was a licensed distributor of Remington firearm products. The defective XMP fire control caused the rifle to misfire without the trigger being pulled killing Shellsea. The tragedy occurred on September 21, 2014 on Drummond Island; MI. Shellsea was 12 years old and resided with her parents.

2

6. Venue is proper within the Northern Division of the Western District of Michigan because the **(a)** incident that gives rise to this complaint occurred within Chippewa County, Michigan, **(b)** plaintiff is a resident of Chippewa County and **(c)** Defendant's sale of the defective and dangerous firearm occurred in Chippewa County. Further, Chippewa County is in the Western District, Northern Division.

### COMMON ALLEGATIONS

7. Plaintiff is Shellsea's mother and is a retired U.S. Coast Guard medical corpsman. She was familiar with the operation of handguns and rifles. She participated in target shooting and frequented stores that sold hunting weapons and equipment and regularly read hunting magazines.

8. Remington is engaged in the business of designing, manufacturing, assembling, distributing and selling firearms.

9. Defendant in 2006 introduced into commerce Remington Model 700 and Model Seven bolt action center fire rifles equipped with an X-Mark Pro (XMP) fire control system knowing, expecting and intending that these rifles would be considered "safe" for use by consumers alone and around members of the general public.

10. These XMP rifles hereinafter will be referred to as 1st Generation XMP's. They were manufactured between 2006 and April 9, 2014, the date Remington posted a warning recall notice on its website warning the public: *"Remington is voluntarily recalling Model 700 and Model Seven rifles with X-Mark Pro (XMP) triggers manufactured from May 1, 2006 and April 9, 2014." "For your safety, **STOP USING YOUR RIFLE** and immediately contact Remington."*

11. The 1st Generation XMP equipped rifles replaced Remington's earlier bolt action models that began manufacture in 1948. The pre-XMP rifles used the Walker fire control system. Remington sold approximately 5 million of these Walker bolt action rifles, including the Model 700. As will be alleged later, these bolt action rifles containing the Walker fire control are unreasonably dangerous because all of them can fire without a trigger pull under various foreseeable circumstances.

12. Remington had actual knowledge of a significant number of unintended Walker rifle discharge incidents, yet did nothing for years to recall and replace the fault-prone Walker fire control with a safe system, admit the danger to the public and at a minimum educate the public how to safely un-cock the rifle with a cartridge loaded in the chamber thus allowing for 100% foolproof safe carry and handling.

13. Jose' Lefebre was the father Shellsea and a 100% medically disabled, retired career US Coast guard corpsman. He was an avid hunter and familiar with handling firearms. Like his wife, he regularly browsed hunting magazines and frequented stores that sold firearms and ammunition. Jose' purchased the Model 700 rifle new in 2011but due to acute medical issues did not use the rifle until 2012. Not more than one box (20 cartridges) had been fired thru the rifle prior to the September 21, 2014 tragedy. The rifle and components on that day were in the exact configuration as when manufactured.

14. Jose' and daughter Shellsea were hunting deer on Drummond Island the weekend of September 20, 2014 in the company of Nathan Ernst, a college student, and 12-year old sister Sarah. The hunt was a special once-a-year weekend youth event. Jose' errantly believed he was also allowed to hunt due to his 100% military disability status. He was

unaware that he could not lawfully transport a loaded rifle in his vehicle, although he knew that he could not shoot while inside his vehicle.

15. Jose' went "road hunting" the morning of September 21 looking for deer. His vehicle was a four-door pickup. He loaded the rifle chamber and made sure the thumb safety was in the "safe" position. He then positioned the rifle with the buttstock at the passenger's floorboard and muzzle pointing up and to the rear. He was alone in his pickup.

16. Unbeknownst to Jose', the thumb safety lever apparently caught on a close-by phone charger cord as he positioned the rifle. The entangled thumb safety likely moved forward to the "fire" position during the rearward positioning motion. The rifle stayed that way and so positioned for the duration of the morning.

17. Shellsea joined her father later that morning. They continued a slow drive looking for deer along back roads. She seated herself in the right-front passenger's seat. The rifle went untouched. Jose' and Shellsea returned to camp and met with Ernst and sister. It was around noon and the four decided to drive to town for lunch. Ernst occupied the right front seat, Shellsea the left rear behind her father with Ernst's sister in the right rear seat.

18. The untouched rifle tucked between Ernst's left leg and an interior panel remained pointing rearward with no one touching it as Jose drove along a compact dirt road heading for the intersection of the main road into town. All on board were talking and occupied looking for deer.

19. The plan was to stop near the main road intersection and unload and case the rifle. The tangled power cord may have inadvertently moved causing the safety lever to move and the rifle to discharge as Jose' was driving. The bullet struck Shellsea in the lower right

jaw killing her instantly. Trigger pull did not cause the misfire. Neither Jose' nor Nathan touched the rifle.

20. The unintended discharge was caused by Remington's defective assembly of the rifle's X-Mark Pro fire control mechanism as will be more particularly alleged further in the Complaint. The flawed assembly involved the use of a bonding agent (Loctite 660) not suited as a thread locker, excessively applied to the blocker and trigger engagement screws, improper curing of the Loctite placed outside the threads and/or allowed to escape outside the treads and thereafter  remain unnoticed by negligent quality control.

21. The Loctite 660 that was applied outside the blocker screw compartment or allowed to escape improperly cured came in contact with the face of the trigger causing imperfect and delicate engagement of the sear. Jarring of the vehicle likely caused the precariously seated sear or other parts to move and fire the rifle. Alternately, unintended movement of the safety lever likely caused the trigger to internally pull, move the sear and fire the rifle.

22.  All of the foregoing including negligent field testing flawed the fire control and trigger reset function making the rifle dangerously defective and unreliable and also vulnerable to debris from outdoor use causing all of which contributed to rifle discharge without a trigger pull from a variety of use situations including jarring and movement of the thumb safety.

23. Remington's egregious inattention to proper assembly and later inexcusable, willful and wanton delay in appropriately notifying the public of the defect allowed 2,500,000 defective and dangerous XMP equipped rifles to be sold and used over 8 years of production and Shellsea Lefebre to suffer a wrongful death.

6

24. The fatal, unintended discharge was proximately caused by undetected errors in Remington's assembly process that fouled the XMP fire control and making it vulnerable to unintentional discharge from a slight jarring motion or movement of the safety lever.

25. The unintentional discharge was consistent with some 400+ other consumer complaints of 1st generation XMP rifle misfires. An incident on December 23, 2011 in North Carolina stands out. Anthony Blackwell was at home and was removing his XMP equipped 308 Win Model 700 from a soft case when it discharged. He was unaware that a cartridge was in the chamber with the fire control cocked.

26. Blackwell's rifle discharged without a trigger pull. The bullet travelled out the window killing a girl walking on the other side of the street. The bullet exited, struck another girl walking behind, and then exited again striking an adult woman. Suit on behalf of the deceased and injured was commenced in Mecklenburg County Superior Court on or about December 9, 2013. Expert analysis confirmed the unintended discharge was caused by excess Loctite 660 that at one time had exited the blocker screw compartment and bonded the head of the screw to the trigger block.

27. Plaintiff adopts and restates where applicable the May 14, 2015 expert causation and liability testimony of John Thomas T. Butters, PE given during discovery video examination deposition by Remington counsel Dale G. Wills in the matter of McNeal, et al  v Remington Arms Company, LLC (Case No. 13-CvS-21261, State of North Carolina, General Court of Justice, Mecklenburg County)

28. Remington recklessly and wantonly reacted slowly to incoming XMP discharge complaints and incidents of injury and death from non-trigger pull discharges. Derek Hawkins, a Remington engineer, chose to inspect 70 of the involved XMP rifles in early

2014. He tested four and found each to fire without a trigger pull. He and others from Remington discovered the causation culprit to be the misapplication of Loctite 660 as heretofore described. He tested no more.

29. Although Hawkins' testing was statistically less than valid, it nonetheless convincingly demonstrated certain circumstances that would cause cocked rifles to discharge from a variety of non-trigger pull situations.

30. Derek Hawkins inspected and took apart the Lefebre rifle in January 2015 at the offices of the Chippewa County Sheriff. The inspection was filmed and the rifle and parts photographed during the two-hour proceeding. Hawkins used special equipment to close-up photo the blocker screw compartment.

31. **Exhibits 1 and 2** in Plaintiff's Appendix of Complaint Exhibits are macro photographs of the blocker screw compartment taken by Derek Hawkins during his January 2015 inspection of the Lefebre rifle. **Exhibit 1** shows the blocker screw head nearly touching the face of the trigger. Excess Loctite can be seen on the blocker screw threads. **Exhibit 1** shows the fire control in the "safe" mode. **Exhibit 2** shows the fire control in the "fire" mode with the head of the blocker screw separated from the face of the trigger block. The photo evidence of Loctite is a convincing indication the XMP fire control was assembled contrary to Remington's intended standards and thereafter sold to Jose' Lefebre in a defective and dangerous condition prone to discharge without trigger pull.

32. **Exhibit 3** in Plaintiff's Appendix of Complaint Exhibits is a photo of a 2nd Generation XMP post-recall fire control. Remington installed this particular fire control in a consumer's early Model 700 chambered in "7 MM Express Remington" that was returned on October 6, 2014 following an unintended Walker fire control discharge

8

incident. Remington replaced the Walker control with the post-recall 2nd Generation

XMP.

33. **Exhibit 3** provides a close-up view of the blocker screw compartment when the thumb

safety lever is in "fire" mode. The head of the blocker screw is separated from the trigger.

The blocker screw compartment is completely free of Loctite. This is how the

compartment should look if manufacturing/assembly specifications and quality control

parameters are followed.

34.  Remington owed duties to Shellsea as the member of the family of the "consumer" who

purchased Defendant's product. These duties arose under the Common Law of Michigan,

the Uniform Commercial Code, the Michigan Consumer Protection Act, and the

Magnuson-Moss Consumer Products Liability Act. Among others that may be stated or

implied in the above, the duties include:

(a)  To exercise reasonable and ordinary care in the formulation, testing, design,

manufacture, assembly and marketing of XMP rifles that was reasonably safe for

intended use without the hidden risk of deadly unintended discharge.

(b)  To impliedly and expressly warrant the XMP equipped Model 700 rifle to be

reasonably safe for intended use without the hidden risk of unintended discharge from

jarring or movement of the safety lever.

(c)   To refrain from unfair, unconscionable and deceptive methods, acts and practices in

the conduct of commerce and to refrain from failing to reveal a material fact the

omission of which would tend to mislead or deceive consumers and which could not

be known or discovered by a consumer.

9

(d) To promptly and effectively notify Shellsea's father and mother and the public in general of the defective XMP fire control and risk of unintended discharge by all reasonable  means to effectively broadcast warnings not to use the rifle that due to a defective XMP fire control could fire accidently without trigger pull with risk of injury or death to the purchaser, members of the family and those otherwise in proximity.

(e) To adequately educate consumers of the Model 700 rifle of the easy and effective means to un-cock the rifle with a cartridge in the firing chamber thus making the rifle incapable of firing under any condition and therefore 100% safe for intended consumer use.

(f) To adequately and promptly explain to the consumer who purchased the Model 700 rifle why they should not "rely on the safety".

35. That as a proximate result of Remington's breaches of duty set forth hereafter Shelsea Lefebre suffered a wrongful death on September 21, 2014.

36. Shellsea was a bright young girl with a reasonable expectation of earning a living in later years. She is survived by her parents, a half-sister Juseliz (DOB 8/22/2001) and full sisters Joy Marie (DOB 5/14/2003) and Malia (DOB 3/28/2005).

**WHEREFORE:** Plaintiff Michelle Marie Lefebre on behalf of the Estate of Shellsea Blair Lefebre-Schiel and heirs claims all pecuniary, compensatory damages allowed under the Michigan Wrongful Death Act including the cost of burial as well as the loss of love, society, companionship and affection of the deceased as well as the deceased loss of earnings on reaching majority and thereafter.

10

## COUNT I: NEGLIGENT PRODUCT MANUFACTURE

37. Plaintiff incorporates by reference each paragraph of the Common Allegations as though fully restated herein.

38. Remington breached its duty to Plaintiff's decedent by: (a) failing to follow its own manufacturing and assembly specifications, (b) using an inappropriate class of bonding agent, (c) misapplying the bonding agent in excess outside the thread compartments, (d) otherwise allowing migration outside trigger compartments, (e) improper curing such that the bonding agent became gummy rather than hard, (f) allowing substandard quality control and (g) failing to adequately test production samples under conditions of anticipated consumer use.

39. Remington negligently selected Loctite 660 as its bonding agent even though the Loctite manufacturer indicated in its published specifications that 660 was *"designed for the bonding of cylindrical fitting parts, particularly when the bond gaps approach 0.50mm (0.02 in)."* Loctite 230 was the proper bonding agent. According to the manufacturer's specifications was *"designed for the permanent locking and sealing of threaded fasteners."*

40. Remington is now using Loctite 230 in the assembly of post-recall 2nd generation XMP fire controls for its bolt action rifles.

41. Remington's breaches flawed the trigger reset mechanism, proper operation of the sear, and generally impaired the intended safe reliability of the XMP fire control making it vulnerable to fouling from debris that could reasonably be expected to enter the fire control from use in the field. Plaintiff incorporates by reference the relevant discovery

deposition testimony of John T. Butters P.E. answering questions from Remington's counsel in McNeal, et al. vs Remington previously identified in the Common Allegations.

42.  Mr. Butters states with particularity the various manufacturing and assembly errors that flawed the XMP fire control such that unintended discharges occur without trigger pull.

43.  Remington's substandard practices allowed an eight-year production run of some 2,500,000 defective XMP equipped rifles that were dangerous with foreseeable risk of discharge without trigger pull exposing consumers and family members with risk of injury or death. Jose' Lefebre's Model 700 was one of the defective rifles.

44.  John Sherk is a Remington attorney. He appeared for Remington in a February 14, 2017 evidentiary hearing before Hon. Otrie D. Smith in the Remington Recall Class Action (Pollard vs Remington Arms Company, LLC, U.S. District Court, Western District of Missouri: (Case No. 4:13-CV-00086-ODS). He made the following admission: (Doc #220 T 19-20)

> *"We had an incident arise with the X-Mark Pro where we were alerted as to a problem with the X-Mark Pro. We figured it out. The company at that time {did} a voluntary nationwide recall. We looked at the assembly process, and we fixed it. And now we are making superb X-Mark trigger mechanisms that are safe and effective."*

45. Shellsea Lefebre was one of the reasonably foreseeable victims of the *"problem with the X-Mark Pro"*. Remington's *"problem"* was a proximate cause of her death.

**WHEREFORE:** Plaintiff prays for judgment against Defendant for compensatory damages in an amount exceeding $1,000,000 based on the verdict of the jury, together the post-verdict award of interest, costs and reasonable attorney fees.

## COUNT II- BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

46. Plaintiff incorporates by reference each relevant paragraph of the Common Allegations and Count I as though fully restated herein.

47. Remington sale of the rifle to Jose' included an implied warranty that the product was reasonably safe and fit for use and in a condition free of manufacturing related defects that could render the product unreliable and unreasonably dangerous to possess, handle or for humans to be in close proximity to the rifle.

48. Remington's implied warranty ran in favor of Shellsea Lefebre who was a resident in the home of her father, Jose' Lefebre.

49. Remington breached its implied warranty in the ways and manner previously alleged in the Common Allegations and Count I.

50. Remington's breach of implied warranty was a proximate cause of the death of Shellsea Lefebre.

**WHEREFORE:** Plaintiff prays for judgment against Defendant for compensatory damages in an amount exceeding $1,000,000 based on the verdict of the jury, together the post-verdict award of interest, costs and reasonable attorney fees.

## COUNT III- BREACH OF EXPRESS WARRANTY

51. Plaintiff incorporates by reference each relevant paragraph of the Common Allegations and Count I as though fully restated herein.

52. Remington sale of the rifle to Jose' included an express warranty that *"your Remington firearm will be free from defect in material and workmanship."*

53. Remington's express warranty ran in favor of Shellsea Lefebre who was a resident in the home of her father, Jose' Lefebre.

13

54. Remington breached its express warranty in the ways and manner previously alleged in the Common Allegations and Count I.

55. Remington's breach of express warranty was a proximate cause of the death of Shellsea Lefebre.

**WHEREFORE:** Plaintiff prays for judgment against Defendant for compensatory damages in an amount exceeding $1,000,000 based on the verdict of the jury, together the post-verdict award of interest, costs and reasonable attorney fees.

### COUNT IV– VIOLATION OF MICHIGAN CONSUMER PROTECTION ACT

56. Plaintiff incorporates by reference each relevant paragraph of the Common Allegations and Count I, II and III as though fully restated herein.

57. Remington engaged in unfair and deceptive acts or practices in the conduct of its commerce in violation of M.C.L 445.903 (s) (Michigan Act) in that it *"failed to reveal a material fact to the public in general and to Jose' Lefebre in particular which tends to mislead or deceive the consumer, and which fact or facts could not reasonably be known by the consumer."*, and 445.903 (cc) in that it *"failed to reveal facts that are material to the transaction in light of representation of fact made in a positive manner".*

58. The material facts are stated in the Common Allegations and previous counts and include:

- Failure to disclose the rifle could fire without trigger pull due to jarring or movement of the safety lever

- Failure to disclose defects in manufacture and assembly of the fire control

- Failure to disclose the rifle was not manufactured free of defects in material and workmanship.

14

59. Shellsea Lefebre as a member of the Jose' consumer's family was protected under the Michigan Act.

60. Remington's violation of the Michigan Act was a proximate cause of the wrongful death of Shellsea Lefebre.

**WHEREFORE:** Plaintiff prays for judgment against Defendant for compensatory damages in an amount exceeding $1,000,000 based on the verdict of the jury, together the post-verdict award of interest, costs and reasonable attorney fees.

### COUNT V – VIOLATION OF MAGNUSON-MOSS ACT

61. Plaintiff incorporates by reference each relevant paragraph of the Common Allegations and Counts I, II and III as though fully restated herein.

62. The Magnuson-Moss Consumer Protection Products Liability Act, 15 U.S.C. § 2301, et seq. (Act) provides a private right of action to consumer's and purchasers of consumer products against retailers who, inter alia, fail to comply with the terms of an express or implied warranty.

63. Shellsea Lefebre was a protected "consumer" as defined in §2301(3) of the Act. The Lefebre rifle was a "consumer product" as defined in §2301 (5) of the Act.

64. Remington's Modell 700 rifle with defective XMP fire control was manufactured and assembled with defects in material and workmanship as heretofore set forth in previous Counts.

65. Remington's breach of express warranty was a proximate cause of Shellsea's wrongful death.

66. Plaintiff and members of Shellsea's immediate family as previously identified have suffered damages as a proximate result of Remington's breach of express warranty.

**WHEREFORE:** Plaintiff prays for judgment against Defendant for compensatory damages in an amount exceeding $1,000,000 based on the verdict of the jury, together the post-verdict award of interest, costs and the award of reasonable attorney fees as allowed under the Act for violation of the Act and or violation of implied and express warranties under state law.

## COUNT VI – EXEMPLARY DAMAGES FOR FAILURE TO WARN, GROSS NEGLIGENCE, WILLFUL, WANTON MISCONDUCT, RECKLESS, WILLFUL DISREGARD FOR HUMAN LIFE

67. Plaintiff incorporates by reference each relevant paragraph of the Common Allegations and Counts I, II, III, IV and V though fully restated herein.

68. Remington knew well before 2011 (the year that Jose' purchased the rifle) from consumer complaints of incidents that its Model 700 and Model Seven rifles equipped with 1st generation XMP fire controls had a propensity to unexpectedly discharge without pulling the trigger. Yet Remington willfully, wantonly and reckless for years followed its long standing corporate policy groomed during the years of Walker rifle production and deliberately chose not to undertake a campaign to investigate and look for the cause or causes including the careful examination of its manufacturing procedures or request the return of all rifles that reportedly had misfired. The company dragged its feet delaying to thoroughly test the rifles in an attempt to duplicate misfires or determine their cause.

69. Remington also knew well before 2011 that consumers who had purchased these rifles as well as bystanders had suffered injury and death caused by XMP equipped bolt action rifles that had reportedly discharged without a trigger pull.

70. Remington's failure to timely investigate the cause, discover and/or admit that its fire control was flawed and dangerous and adequately warn the public and its purchasers of

16

the grave risk of death and injury was purposefully, intentionally carried out with willful and wanton disregard for human life consistent with its long-standing corporate policy of indifference to human life that had existed for years related to deaths and injury caused by the unintentional discharge of its bolt action rifles equipped with Walker fire controls.

71. The history of Remington's reckless policy to conceal from the public and deny that its Walker equipped bolt action rifles were unreasonably dangerous due to poor fire control design and given to sudden and unexpected discharge without a trigger pull is best described in the May 30, 2017 Complaint filed in the United States District Court for the District of Montana, Billings Division in the matter of Fernando Contreras vs Remington Arms Company, LLC, Case No .1-17-cv-00075, SPW-TJC. Doc #1.

72. Plaintiff incorporates by reference paragraphs 20-37 of the Common Allegations of the Contreras Complaint as though fully restated herein.

73. Remington's reckless policy regarding the concealment of its defective Walker fire control rifles was driven solely by economic considerations to save corporate money and reduce profits and costs. This purposeful, tortious policy was carried forward, continued and applied recklessly during the pre-April 2014 years of XMP 1st generation production when regular reports of misfire incidents had been received which should have impacted Remington (but did not) to realize that its XMP fire control rifles not unlike the earlier Walker rifles had a a dangerous propensity to discharge resulting in death and injury to handlers and bystanders.

74. Remington knew that its XMP fire control was not safe and therefore warned purchasers

"*not to rely on the safety*" yet failed to inform purchasers that the reason was based on years of reports of unintended discharges from fire control's that had a propensity to discharge without a trigger pull.

75. Despite its caution that purchasers should "*not rely on the safety*" and knowledge that flaws related to XMP manufacture made the rifles unsafe, Remington deliberately failed to publish instructions and educate handlers how to make their rifles 100% safe (even with a round in the chamber) by a simple maneuver that un-cocked the bolt. Remington had a duty to educate its consumer.

76. Jose' Lefebre and the public was incapable of knowing and did not know that Remington rifles equipped with an XMP fire control had the propensity to discharge without a trigger pull with the risk of injuring and killing users or those close by.

77. Defendant owed a duty to users and purchasers including Jose' Lefebre to adequately warn of the defect of the Remington XMP Model 700 rifle prior to and after the sale of the product.

78. Remington's failure to warn the public including Jose' Lefebre of the risks associated with the XMP equipped Remington Model 700 rifle and that these rifles were dangerous due to faulted manufacture was driven by economic considerations that reflected the company's policy of indifference to the risk of human life.

79. Remington through its investigation and rifles that reportedly had unintentially fired without trigger pull, determined that Loctite 660 was not the appropriate thread locking bonding agent and too much had been applied during rifle assembly which flawed the operation of the fire control making it unreliable and the exclusive or contributing cause of unintended rifle firing. It also determined that its quality control was deficient thus

allowing some 2,500,000 XMP rifles to be manufactured and used by an unknowing
public at risk of injury or death.

80. Remington's discovery led to an immediate correction of its assembly process in April
2014 changing to the bonding agent to Loctite 230 which the manufacturer specifically
intends the product for use as a thread locker and carefully applying it only inside of the
screw thread compartment with proper curing to assure desired hardening.

81. Remington at long last recognized its legal duty and obligation to warn the public and the
purchasers of the 2,500,000 rifles that were subject to the recall warning and in the weeks
or maybe months immediately prior to April 11, 2014 developed a Product Safety
Warning and Recall Notice of Model 700 and Model Seven rifles manufactured from
May 1, 2006 and April 9, 2014.

82. Despite the adequacy of the recall warning content, Remington made the decision to keep
the warning from reaching Jose' Lefebre and other purchasers by limiting the posting to
only the Remington website.

83. Remington knew or in the exercise of reasonable care should have known and recognized
the obvious; owners of Remington firearms do not get up in the morning and scan
Remington's website while having their morning coffee.

84. Remington's decision to limit publication to no more than its website was no different in
effect than not to publish at all. They had no knowledge of the recall or warning that the
Model 700 rifle purchased in 2011 was defective with a propensity of misfire without
trigger pull.

85. Remington was a defendant in a 2013 class action suit to recall its defective and
dangerous bolt action rifles equipped with the Walker fire control. Ian Pollard vs

Remington Arms Company, United States District Court, Western District of Missouri;
Case No. 4-13-CV-00086-ODS.

86. Remington during early proceedings disclosed that it had voluntarily posted a product
safety warning and recall of its XMP rifles. Due to its involvement in the class action
suit, Remington became aware of what it should have known: posting of a warning recall
was grossly ineffective.

87. Despite its early 2014 realization that posting the recall warning by website alone was
inadequate to warn the public and purchasers that XMP equipped rifles could discharge
unintentionally without trigger, Remington recklessly acted with gross indifference to
human life and failed to take cost effective measures to make sure Jose' Lefebre and
citizens of Michigan's Upper Peninsula were warned not to use their XMP rifles.

88. Remington too late to save Shellsea changed its post-September 2014  publication effort
that involved state-of-the- market targeting techniques:

- notices broadcast on radio covering 98% of the US

- posters sent to 11,000 retail stores marketing Remington firearms

- publication on social media

- publication in hunting magazines

89. Remington's failure to publish broadly and thoroughly during the months before April
2014 and certainly prior to September 21, 2014 knowing 2,500,000 defective XMP rifles had
been purchased was reckless, wanton and represented a culpable indifference to human life
that threatened so many consumers who had no knowledge of the defective rifle and
documented risk of death and injury.

90. Remington's breach of duty to adequately warn and educated was a proximate cause of the death of Shellsea Lefebre.

**WHEREFORE:** Plaintiff prays for judgment against Defendant for exemplary damages in an amount exceeding $5,000,000 based on the verdict of the jury, together the post-verdict award of interest, costs and the award of reasonable attorney fees.

Dated this 15th Day of September, 2017

> Leonard A. Siudara (P20542)
> By: /s/ Leonard A. Siudara
> Attorney for Plaintiff
> Suite 100
> 5865 Andover Ct.
> Troy, MI 48098
> (P) (248) 417-7300
> (I) budatlaw@msn.com

## DEMAND FOR JURY TRIAL

Plaintiff, Michelle Marie Lefebre hereby Demands Trial by Jury in this cause.

> Leonard A. Siudara (P20542)
> By: /s/ Leonard A. Siudara
> Attorney for Plaintiff