IN THE UNTIED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF MICHIGAN

NORTHERN DIVISION

MICHELLE MARIE LEFEBRE,                     Case No.  2-17-cv-00152-GJQ-TPG
PERSONAL REPRESENTATIVE OF THE
ESTATE OF SHELLSEA BLAIR LEFEBRE-SCHIEL,

        Plaintiff,

          -Vs-

REMINGTON ARMS COMPANY, LLC.

        Defendant.
_____/

**Attorney for Plaintiff**
Leonard A. Siudara (P20542)
Leonard A. Siudara PC
5865 Andover Ct, Troy, MI 48098
(T) 248-417-7300
(F) 248-641-8141
(E) budatlaw@msn.com

## 1<sup>st</sup>AMENDED COMPLAINT

1. Now Comes Plaintiff, Michelle Marie Lefebre by and through counsel, and for her 1ST

   Amended Complaint filed as a matter of course pursuant to F.R.C.P. (a) (1) (A) and claiming

   compensatory and exemplary damages against Defendant, Remington Arms Company,

    LLC, as may be allowed under the M.C.L. 600.2922, Michigan Wrongful Death Act and

   other causes of action stated herein, alleges as follows**:[1]**

   _____

   **[1]** The paragraphs under the headings: "The Early Model 700 Walker Fire Control Rifles", "Anatomy of
   the XMP Fire Control", "The Tragedy" and "Analysis of the Lefebre Model 700 XMP Malfunction"
   will be referred to collectively as the "Common Allegations"

## PARTIES

2.  Plaintiff Michelle Marie Lefebre, is a resident of Chippewa County, citizen of the State of Michigan, and duly appointed personal representative of the Estate of Shellsea Blair Lefebre-Schiel (Shellsea) acting pursuant to Letters of Authority issued on September 24, 2015 by Chippewa County Probate Court, (Case No. 15-27147-DE).

3.  Defendant Remington Arms Company, LLC (Remington) is a Delaware Corporation with its principal place of business at 870 Remington Drive, Madison, NC, 27025.

4.  Shellsea was a bright young girl with a reasonable expectation of earning a living in later years. She is survived by her mother, Michelle Marie Lefebre, a half-sister Juseliz (DOB 8/22/2001) and full sisters Joy Marie (DOB 5/14/2003) and Malia (DOB 3/28/2005), all who claim under the Michigan Wrongful Death Statute.

5.  Jose' Lefebre-Toro (Lefebre), although the father of Shellsea and an apparent heir to her intestate estate, has no claim of interest in this wrongful death action. By Order of the Chippewa County Probate Court dated 11/08/207, he cannot claim or take any distribution of funds that may be realized in this action. (**1st Amended Complaint Exhibit 1**)

## JURISDICTION AND VENUE

6.  This Court has subject jurisdiction over this matter pursuant to 28 U.S.C. §1332 in that Plaintiff is a citizen of the State of Michigan, Defendant is a corporate citizen of the State of Delaware, and the amount in controversy exceeds Seventy-Five Thousand ($75,000.00) Dollars, exclusive of interest and costs.

7. This Court has personal jurisdiction over Defendant as Remington does business in the Western District of Michigan. Further, a Remington Model 700 bolt action hunting rifle (rifle) chambered for a Winchester 270 cartridge and equipped with an X-Mark Pro (XMP) fire control with an externally adjustable trigger is one of the principal subjects of this action. The rifle (serial # G6850107) was negligently manufactured and assembled in April 2009 in a defective and unreasonably dangerous condition and purchased new by Lefebre in 2011 at a Remington distributor, the Bass Pro Shop in Mackinaw City, MI.

8. Shellsea Blair Lefebre-Schiel (Shellsea) suffered a wrongful death on September 21, 2014 on Drummond Island in Chippewa County. Shellsea was 12 years old and resided with her parents, Jose' and Michelle Lefebre. She was the innocent victim of a malfunction of the subject Model 700 rifle that unintentionally discharged. The unintended discharge and resulting death occurred because the XMP fire control was negligently assembled in a manner not intended by Remington contrary to its design and assembly specifications.

9. Venue is proper within the Northern Division of the Western District of Michigan because: **(a)** the malfunction discharge of the rifle and Shellsea's wrongful death occurred within Chippewa County, Michigan, **(b)** Plaintiff is a citizen/resident of Chippewa County and **(c)** Defendant does business in Chippewa County, and **(d)** Defendant's culpable misconduct occurred in Chippewa County and included its negligent failure to adequately and timely warn Lefebre and other purchasers and users that Model 700 XMP rifles could malfunction and discharge without the trigger being pulled. Chippewa County is in the Western District, Northern Division.

## THE EARLY MODEL 700 WALKER FIRE CONTROL RIFLES

10. All bolt action hunting rifles manufactured and sold by Remington after WWII were intended by design to discharge (fire) when the "trigger" is pulled and only when the "trigger" is pulled. All of these rifles were equipped with a "safety" mechanism that when engaged prevented the rifle from firing.

11. Remington began manufacturing the Model 700 rifle in 1962 with a "Walker" fire control (commonly referred to as a trigger) that incorporated a component ("trigger connector") that under certain conditions could be fouled by small amounts of debris from use in the field. Fouling allowed the rifle to fire without a trigger pull when the safety lever was moved from "S" (safe) to "F" (fire). Another Walker design quirk that contributed to malfunctions was the internal "bolt lock" that required the safety lever to be in the "fire" position in order to load or unload the rifle.

12. Despite receiving an enormous number of documented complaints of accidental unintended discharge incidents from the field, some tragically resulting in death and injury, and ignoring its own experiences of accidental firings, Remington refused to make any design changes to Model 700 Walker fire control rifles until litigation in 1982 involving the death of a 9-year old Montana boy forced Remington to get rid of the "bolt lock".

13. Remington finally stopped manufacturing Walker fire control Model 700 rifles in 2006, but not before 5 million copies had been sold worldwide.

## ANATOMY OF THE X-MARK PRO FIRE CONTROL.

14. The Model 700 with the X-Mark Pro (XMP) fire control was introduced in 2006. The XMP control design did not retain the "trigger connector" which was at the cause of the

4

unintentional Walker rifle discharges.  The new rifle could be loaded and unloaded with the safety in the "S" position.

15. The XMP Model 700 safety lever is located behind the bolt convenient for the shooters thumb to move the lever forward and back from "S" (safe) to "F" (fire). **(1ˢᵗ Amended Complaint Exhibit 2)**

16.  The lever has a relatively short range of motion and is capable of being balanced (delicately) in between "S" and "F" in what is called the "null" position. The safety lever on the Lefebre rifle required 50% less force to move it from "S" to "F" than from "F" to "S". The dangerously easy movement allowed the rifle to be in the "F" (Fire) mode after the lever was fouled by a phone charger cord when the rifle was positioned in the vehicle as will be later described.

17. The XMP Model 700 was not designed to unintentionally discharge (fire) under any condition; especially not when the "safety" moved to the "F" (fire) position from either the "S" (Safe) or "null" positions or if the rifle should get bumped during handling when the safety was in the "F" (Fire) position.

18. The finger trigger pulled by a shooter to fire the rifle is the visible part of the XMP trigger mechanism. The trigger is surrounded by a trigger guard designed to protect against inadvertent or unintended pull action. **(1ˢᵗ Amended Complaint Exhibit 3)**

19. The invisible part of the trigger mechanism is the "trigger block" concealed inside the rifle stock and contained in a metal housing. The entire contained mechanism that fires the rifle is called the "fire control".

20. The XMP Model 700 is cocked and ready for firing when the bolt action is cycled. The cocking cycle simultaneously initiates three movements: (1) brings the spring-loaded striker

(commonly called the firing pin) into tension ready to strike the chambered cartridge, (2) forces the spring-loaded sear up and under the striker preventing its forward motion while under spring-loaded tension, and (3) positions the trigger block so that its upper rear corner moves under the lower forward corner of the "sear" holding it in place thus preventing striker release.

21. The point where the top rear corner of the trigger block supports the forward lower edge of the sear is called the "engagement". (**1st Amended Complaint Exhibit 4**)

22.  The trigger/sear engagement of an XMP fire control is typically designed at 0.020 (a mere twenty thousands of an inch) that equates to roughly the width of 5 human hairs.

23. The trigger mechanism moves on a pivot point. When the shooter pulls back on the finger trigger to fire the rifle, the hidden trigger block pivots forward away from the point of sear engagement. The forward movement allows the spring-loaded sear to drop which in turn releases the spring-loaded striker allowing it to slam forward to hit the rear of a chambered cartridge and fire the rifle.

24. The XMP safety lever is mechanically linked to a blocker screw that is positioned and set according to design specifications. Moving the safety lever to the "S" position causes the blocker screw to come in contact with the face of the trigger block and prevent it from moving forward from the point of sear engagement. The rifle will not fire when the safety is in the "S" position.

25. A small portal on the left side of the fire control housing allows the blocker screw compartment to be visibly inspected after assembly when the safety is in "S" mode and the screw is in contact with the face of the trigger block preventing forward movement. (**1st Amended Complaint Exhibit 5**)

26. . The portal also allows the blocker screw to be seen when the safety lever is in the "F" mode (**(1st Amended Complaint Exhibit 6**) and the screw has been moved away from the face of the trigger block. When the blocker screw is moved away, the trigger block can move forward and disengage from the sear when the shooter pulls back the finger trigger to fire the rifle.

27. The safety mechanism on the Lefebre Model 700 demonstrated the following characteristics during examination on January 6, 2015 that support the alternative allegations that Remington's design specifications negligently allowed the safety lever to easily move from "S" to ("F)  with 50% less force that was required for movement from "F" to "S", or assembly/manufacturing errors allowed 50% less force to move  the safety from (S") to  "F": **(a)** 6.178 lbs. was the average pressure needed to move the safety from "fire" to "safe" position, and **(b)** 2.97 lbs. was the average pressure to move the safety from "safe" to "fire". Only a few ounces of pressure are required to move the safety from the delicately balanced "null" position to the "S" position.

## **THE TRAGEDY**

28. Lefebre and daughter Shellsea were hunting deer on Drummond Island the weekend of September 20, 2014 in the company of Nathan Ernst, a college student, and 12-year old sister Sarah. The hunt was a special once-a-year early season Liberty Hunt.

29. Shellsea Lefebre was issued a special youth DNR hunting license and harvested a doe on September 20, 2014. The animal was dressed and hung at camp with license affixed.

30. Lefebre errantly believed he was also allowed to hunt due to his 100% military (Coast Guard) disability status. He also was unaware he could not lawfully transport a loaded rifle in his vehicle, although he knew he could not shoot while inside his vehicle.

31. Lefebre went looking for deer on the morning of September 21st. His vehicle was a four-door pickup. He loaded the Model 700 rifle and made sure the thumb safety was in the "safe" position. He then positioned the rifle with the buttstock at the passenger's floorboard and the barrel resting on the right-front passenger's window. He was alone in his pickup.

32. Shellsea joined her father later that morning as a non-hunting passenger. She seated herself in the right-front passenger's seat. The rifle with the buttstock on the floorboard and to the left of her left leg was repositioned so the rifle barrel was pointed aft.

33. Lefebre and daughter returned to camp and met Ernst and his sister. Later, around noon, the four decided to drive to town for lunch. Ernst occupied the right front seat, Shellsea the left rear behind her father with Ernst's sister in the right rear seat.

34. The rifle was positioned between Ernst's left leg and an interior vehicle panel and remained pointing rearward as Lefebre drove along a dirt road heading to intersect the main road into town. All on board were talking and occupied looking for deer.  The plan was to stop near the main road intersection and unload and case the rifle.

35. The rifle suddenly fired without anyone touching or pulling the trigger. The bullet struck Shellsea killing her instantly.

36. Investigation by the Chippewa Sheriff's Department confirmed: *"a very recently severed charger cord with the point of severance in close proximity of the trigger" (and the safety lever). Severance of the tangled cord is thought to have occurred from the rifle's blast recoil that ripped the cord from the DC plug."*

37. The Chippewa Sheriff also confirmed that the rifle discharge was not caused by either Lefebre or his front passenger pulling the trigger.

## ANALYSIS OF THE LEFEBRE MODEL 700 XMP MALFUNCTION

38. The blocker screw of the XMP fire control was intended to be set to a prescribed extension during assembly to allow exact contact with the face of the internal trigger block when the safety was in the "S" position. The rifle would not fire with the trigger so blocked. Remington's design called for a small amount of Loctite (a thread locker) to be applied to the rear of the blocker and engagement screw threads to "lock" the screws into a prescribed permanent position. Remington's design criteria called for a very small amount of Loctite to be applied to the rear threads of the blocker screw and to remain completely inside the thread compartment where it was to cure (harden) in an oxygen free (anaerobic) environment after so remaining for a prescribed number of hours.

39. On information and belief, Remington in a move to save "costs" outsourced the XMP fire control manufacturing and assembly to a company in Mexico whose production and quality control proved to be substandard.

40. The Lefebre fire control was the victim of multiple assembly deficiencies that included: (1) an unnecessary, excessive amount of Loctite applied to the blocker and engagement screws that was allowed to escape outside the enclosed thread compartments, (2) excess Loctite was allowed to cover the exposed front end of the blocker screw and then come in contact with the face of the trigger block when the safety lever was moved to the "S" position, (3) graphite was allowed to mix with the excess Loctite covering the blocker screw head and trigger block face, (4) the fire control appears to have been coated with paint and debris was allowed in the critical engagement, these manufacturing and assembly errors were contrary to Remington specifications and were neither caught by the Mexican assembler nor Remington's quality control personnel.

9

41. The excessive Loctite mixed with graphite didn't harden. It became sticky creating the potential for the blocker screw to completely and/or partially adhere to the trigger block face when the safety was moved to "S" position.

42. The adherence created an invisible, highly dangerous threat potential for the blocker screw to pull the trigger block forward as the safety lever was moved to the "F" position resulting in either complete sear disengagement and rifle discharge or "precipitous" partial engagement making the rifle vulnerable to spontaneous discharge when inadvertently bumped or jarred during handling. The ambient temperature and excessive humidity were contributing factors to the malfunction.

43. The fatal, unintended discharge was proximately caused by undetected errors in Remington's assembly process that fouled the XMP fire control and making it vulnerable to unintentional discharge from a slight jarring motion or movement of the safety lever.

44. Unbeknownst to Lefebre or the front passenger, the thumb safety lever apparently caught on a phone charger cord during the initial positioning of the rifle or later re-positioning. The entanglement caused the dangerously movable safety lever to easily travel to either into the "F" position or the "null position. The Loctite sticky blocker screw pulled the trigger block forward likely creating precipitous sear engagement which later became completely disengaged firing the rifle and killing the innocent passenger. Alternately, the sticky blocker screw pulled the trigger block from under the sear when the safety lever moved to the "F" position from either "S" or "null" position. One or the other of these probable malfunction scenarios caused Lefebre's rifle to discharge and kill his daughter.

## COUNT I

## NEGLIGENCE and GROSS NEGLIGENCE

## COMPENSATORY and EXEMPLARY DAMAGES

## FAILURE TO PROMPTLY WARN OF HIGLY DANGEROUS PRODUCT

## WILLFUL AND WANTON MISCONDUCT

## RECKLESS DISREGARD FOR HUMAN LIFE

45. Plaintiff incorporates by reference each relevant paragraph of the proceeding paragraphs including the Common Allegations as though fully restated herein.

46. Remington during the years of producing and marketing Walker Model 700 rifles from 1952-2006 developed and steadfastly maintained a culture of deceiving the sporting goods public and customers who purchased Model 700 Walker rifles. Remington intentionally hid the known fact that these rifles under certain conditions would discharge with a trigger pull when the safety was moved from "S" to "F".

47. Remington's deceit was driven by "bottom line" economics; who would buy a Remington Model 700 rifle if a conspicuous tag was placed on each trigger guard stating a clear warning that the rifle could unexpectedly fire when the safety was moved from "S" to "F"?

48. Between 1991 and 2004, Remington's records show 3,273 customer complaints of Remington Walker rifles firing without a trigger pull; an average of approximately 5 unintended firings per week for 13 years. This figure represents an average of unintended firings supported by documents produced by Remington during litigation. Based upon information and belief, the actual number of unintended firings is much higher.

11

49. Remington's internal records also reveal that brand new Model 700 Walker rifles fired without a trigger pull during final testing inside the Remington's factory. Remington's gallery testing documents describe *"Safety malfunction found in our gallery on new rifles."*

50. Between the years 1970 and 1974, an internal Remington document entitled "Justified Complaints," reported 77 brand new Model 700 rifles fired without a trigger pull *"when safe is pushed off."* In addition, the same document reported 66 brand new Model 700 rifles fired without a trigger pull when the rifle was jarred or the bolt was operated.

51. Factory gallery test data on brand new Model 700 rifles manufactured from 1974 through 1991 show the dangerous propensity continued; there were 125 incidents of rifles firing without a trigger pull when the safety was released.

52. Remington continued its practice of protecting its bottom line preferring to deny the existence of the product defect and preferring to breach its duty to promptly warn its past, current and potential rifle purchasers of the hidden danger.

53. Remington's long-standing denial and cover-up was finally exposed with the airing of a 60-minute CNBC television documentary entitled *"Remington Under Fire"* which exposed the dangers of the Walker fire control and firing without trigger pull.

54. Ken Soucy, a Remington employee serving in various high level positions from the 1970's and throughout the 1990's, discussed the CNBC documentary in an email. Soucy stated: *"[w]hat surprised me about the CNBC piece was their failure to mention a very damaging piece of evidence, that being the numerous FSR (fire on safety release) incidents in Remington's own factory, mostly on brand new guns. These occurred due to a tiny sliver of metal being created during the fire control assembly operation. That sliver would get lodged in a position that the trigger would not return to the neutral position. The safety was then*

*released and BAM. In the field, any foreign object of about the same size could, and probably has, produced the same result. <u>If Remington has managed to shield these incidents from your discovery process, they have done a pretty thorough job of cleaning things up."</u>*

55. The occurrence of safety-related malfunctions have been so persistent and common that Remington employees created internal acronyms to use when discussing the various ways the Walker rifles were shown to have fired without a trigger pull. Remington termed "FSR" to describe the most common malfunction: *"fire on safety release"*.

56. Remington's internal records show other acronyms were created to describe unintended firings without a trigger pull; "FOS", which refers to *"firing off safe"*; "JO", or *"jar off"*, which refers to firing if the gun is jarred or bumped; "FBO", which refers to *"firing on bolt opening"*; "FBC", which refers to *"firing on bolt closing"*: and *"fails to fire"*, which refers a failure of the rifle to fire when the trigger is intentionally pulled but the rifle then fires when the bolt or some other part of the rifle is touched.

57. Remington after years of commercial deceit finally decided in 2017 to cease refusing to contest the allegation that millions of Model 700 and other bolt action rifles with Walker fire controls were unreasonably dangerous and given to discharge without a trigger pull.

58. As a defendant in a 2013 class action suit filed in the U. S. District Court, Western District of Missouri, Remington agreed to a supervised recall of Walker fire control rifles dating to 1949. Remington stipulated to an Order Granting Parties Joint Motion for Final Settlement Approval. <u>Ian Pollard vs Remington Arms Company, et al. Case No 4:13-CV-00086-ODS (Document 221 Filed 03/14/17).</u>

59. Within months of bringing the Model 700 XMP to market, Remington began receiving reports from the field describing incidents where these rifles fired when the shooter moved

the safety lever from "S" to "F" and also from other discharge situations not involving a trigger pull. The 1st reported instance was received in November 2006.

60. On information and belief, the number of XMP non-trigger pull discharge incidents reported between 2006 and April 2014 were in the thousands.

61. Misfiring rifles and fire controls were returned to Remington. Some proved to involve obvious after-market fire control tampering. This was no surprise because XMP trigger pull was capable of being adjusted externally and Remington provided instructions to owners. The majority of rifles or fire controls however showed no tampering. The reports of these malfunction firings were credible.

62. Michael Breeze purchased his Model 700 varmint rifle new in December 2009. He took it to the range and fired ten rounds and then was surprised to find that moving the safety from "S" to "F" caused the rifle to fire. The malfunction happened repeatedly.  He contacted Remington's service department (Arm Service) that arranged for shipping. Prior to shipping, Breeze created two videos to preserve evidence of repeated discharges when the safety was moved from "S" to "F" and also when the bolt was slightly moved upward to open the action. He reported that the misfires occurred at 35° ambient temperature. The two videos and rifle were received by Remington in January 2010. (**1st Amended Complaint Exhibit 7**)

63. Remington recklessly dismissed the Breeze videos although its engineers determined firing on bolt close represented "precipitous" sear engagement and recognized that moving the safety lever created unsafe reduced engagement. Remington took no significant action to determine the cause of the misfires although it was confronted with palpable evidence that something with the XMP fire control was wrong and posed a latent life-endangering malfunction to unsuspecting Remington owners and others nearby.

14

64. Reports of incidents of injury and death from unintentional discharges of XMP rifles continued to be discarded. One tragic incident occurred on December 23, 2011 in North Carolina. Anthony Blackwell was at home. His one-year old XMP Model 700 in .308 Win fired as he was removing it from the soft case. He was unaware that a cartridge was in the chamber with the fire control cocked.

65. Blackwell's rifle discharged without a trigger pull. His hand never touched the trigger. The bullet travelled out the window killing a girl walking on the other side of the street. The bullet exited, struck another girl walking behind, and then exited again striking an adult woman.

66. Due to the serious threat of foreseeable serious injury or death to purchasers of the XMP rifles and those in proximity resulting from latent manufacturing defects consumers could not on their own discover until too late, Remington owed a high duty to promptly publish danger warnings by means of effective publication.

67. Consistent with the willful, wanton and reckless disregard for human life demonstrated for decades during the Walker trigger era, Remington did nothing for 6 ½ years to effectually and adequately give warning of this danger to its consumer base who already owned XMP rifles and to potential customers who looked to purchase an XMP rifle.

68. Rifles sent to the Remington from the field with descriptions of non-trigger pull firings were typically returned to the owner after having been checked, minor adjustments made, and muzzle and bore cleaned *"to restore confidence in rifle"* with a note to the owner explaining: *"could not duplicate concern"*.

69. From receipt of the first report of these malfunctions in November 2006 through early 2014, Remington did nothing to seriously investigate the cause of the reported malfunctions other

15

than failed perfunctory attempts to duplicate the reported firing. Although the apparent malfunctions clearly involved the fire control, Remington's engineering and other staff failed to open the fire control housings to carefully assess the quality of manufacturing or assembly looking for reasons. Remington people didn't look into possible design or production errors and issues to explain the repeated malfunction occurrences that would have been discovered if careful and thorough efforts were made.

70. The investigation which should have begun soon after field reports began coming in should have involved (a) a coordinated team effort that included production, customer service and research and development engineers, (b) disassembly and inspection of each reported XMP fire control to look for every possible cause of the reported malfunctions, including looking for evidence that prescribed manufacturing, design and assembly protocols had not been followed, and (c) testing of the rifles and fire controls under all types of temperature and weather conditions attempting to duplicate or provoke misfiring malfunctions.

71. Remington's failure to investigate the cause, discover and/or admit that its fire control was flawed and promptly warn the public and its purchasers by adequate means of the grave risk of death and injury was purposefully and intentionally carried out with willful and wanton disregard for human life consistent with its long-standing corporate policy bred in the Walker rifle era that favored corporate revenue at the expense of human life.

72. Remington's breach of duty to promptly warn was a proximate cause of Shellsea Lefebre's death. Jose' Lefebre would not have purchased the Model 700 in 2011 had he been warned of the dangers that Remington in fact had known for years.

73. A Remington XMP owner, Mr. Otto, purchased a XMP Model 700 in 2011. The following year (2012) during a deer hunt the rifle discharged when the safety was moved to the "F"

16

position. The same discharge occurred during a 2013 deer hunt. He began experimenting and found the unintentional discharge only occurred when the rifle was exposed to extreme - 10° temperature. He published a You Tube video that recorded the repeat firings in -10 ° when the safety lever was moved. **(1st Amended Complaint Exhibit 8)**

74. Mr. Otto in March 2014 sent his rifle to Remington's Arm Service Dept. in Ilion, NY.  The service people could not duplicate the misfire because its test freezer could not go to -10°. The rifle was then sent to Remington's product liability investigator, Derek Watkins, at the  Kentucky facility where the XMP rifle was developed in early 2000. Watkins "soaked" the rifle to -10. He found its XMP fire control repeatedly fired when the safety was moved from "S" to "F". His testing was video recorded.

75.  Remington's engineer with further analysis of the Otto rifle and other Model 700 in factory inventory determined that Loctite 660, a thread locker, was applied to the blocker screw in excess during assembly and remained in uncured liquid form outside of the blocker screw thread compartment. It was further determined that liquid Loctite on the tip of the blocker screw under certain conditions would adhere to the face of the trigger block. The adherence would cause the blocker screw to pull the trigger block out of engagement or into precipitous engagement when the safety was moved from "S" to "F" causing the rifle to immediately fire or fire when the rifle was jarred during handling or when the bolt was moved.

76.  Remington's engineers did not test under conditions of high humidity, higher temperatures or a variety of other field conditions that shooting customers would commonly experience. Remington engineers however did verify that "FSR" (fired on safety release) could occur without customer tampering or alteration and recognized the company had a serious

consumer safety problem. Remington realized that rifles produced as far back as 2006 had failed, presumably due to excess Loctite in the blocker screw.

77. Remington shut down production of XMP rifles within six weeks of testing and inspection of the Otto rifle, factory inventory and inspection of XMP fire controls taken from Model 700 rifles sent in by owners who reported "FSR" discharges. This action is what should have been taken in late 2006 and early 2007 when it began to receive field reports of "FRS" firings. Remington in those early production years had actual knowledge of a latent product defect that posed life threatening risks to owners of Model 700 XMP rifles.

78. Remington on or about April 9, 2014 posted a Product Safety Warning and Recall Notice.

**(1st Amended Complaint Exhibit 9)**

79. The operative language included:

- *Remington is voluntarily recalling Model 700 and Model Seven rifles with X-Mark Pro triggers manufactured between May 1, 2006 and April 9, 2014.*

- *Remington has determined that some Model 700 and Model Seven rifles with XMP triggers could under certain circumstances, **unintentionally discharge.***

- ***STOP USING YOUR RIFLE.** Any unintended discharge has the potential to cause **injury or death**. Immediately cease use of recalled rifles and return them to Remington free of charge. Rifles will be inspected, specialty cleaned, tested and returned as soon as possible, at no cost to you.*

80. Remington's action should have been taken no later than receipt of the Breeze rifle and supporting video in January 2010. The investigation prompted by the return of the Otto rifle and supporting video in March 2014 should have been conducted in early 2010, but wasn't.

81. Remington's willful and wanton dereliction of its duty to promptly warn of latent defects caused Jose' Lefebre to unknowingly purchase a dangerously unsafe rifle in 2011 which in September 2014 killed his daughter.

82. Although Remington had actual knowledge that its Model 700 XMP rifle was dangerously unsafe for handling and posed a demonstrated life threatening risk, it failed to adequately and promptly publish the warning in Michigan's Upper Peninsula in a manner designed to reach Jose Lefebre and every other local Model 700 owner. This would include conspicuous and repeated postings in stores selling Remington arms and ammunition, local newspapers, outdoor and hunting magazines, radio and TV spots as well as on social media.

83. Had Remington promptly, regularly and adequately published its Recall Warning in April, May, June, July, August and early September 2014, by every reasonably available means, Jose' Lefebre, his wife, and his hunting partner surely would have learned of the XMP danger causing Lefebre to leave the rifle at home on September 21, 2014 .

84. Remington's breach of duty to promptly warn as required by law was a proximate cause of Shellsea Lefebre's wrongful death.

**WHEREFORE:** Plaintiff prays for judgment against Defendant for compensatory damages in an amount not exceeding $1,000,000 based on the verdict of the jury, together the post-verdict award of interest, costs and the award of reasonable attorney fees as allowed.

**WHEREFORE:** Plaintiff prays for judgment against Defendant for exemplary damages in an amount exceeding $5,000,000 based on the verdict of the jury, together the post-verdict award of interest, costs and the award of reasonable attorney fees as allowed.

**COUNT II**

**NEGLIGENT DESIGN/MANUFACTURE**

**DANGEROUS DEFECTIVE FIREARM NOT FIT FOR ORDINARY PURPOSE**

85. Plaintiff incorporates by reference each relevant paragraph of the proceeding Counts including the Common Allegations and Count 1, as though fully restated herein.

86. At all relevant times Remington adopted a firearm industry standard that no firearm should be designed, manufactured or assembled would be capable of firing without the trigger being pulled.

87. Having adopted that standard, Remington owed a duty to its purchasing customers and to the public to design, manufacture and assemble its post-Walker Model 700 rifle with a fire control that could not and would not discharge without the trigger being pulled.

88. A hunting rifle designed, manufactured and assembled in a manner that allowed it to fire without the trigger being pulled has been adjudged as a matter of law to be *"defective and not fit for its ordinary purpose"*. O'Neal vs Remington Arms Company, L.L.C  803 F.3d 974 (8th Cir. 2015)

89. Remington breached its duty by designing, manufacturing and assembling the Model 700 bolt action rifle with the XMP fire control that would allow firing without the trigger being pulled. Remington began manufacturing these defective rifles on or about May 1, 2006.

90. Remington as early as November 2006 began receiving reports from XMP owners that the rifles would fire when the safety lever was moved from "S" to "F" and by lifting the bolt after the safety was moved to "F". The reports were numerous, credible and included video recordings of the firing events. Misfiring rifles were sent to Remington. The involved fire

controls were saved. The rifles were serviced and returned to the customers after new fire controls were installed.

91. Remington dragged its feet delaying serious investigation of the XMP fire control in March 2014 and in short order determined that errors during fire control assembly allowed excess Loctite to go outside the safety blocker screw thread compartment. The excess Loctite caused the blocker screw to adhere to the trigger block and pull the block forward causing complete and instant firing or partial sear disengagement and delayed firing when the safety lever was moved from "S" to "F". Remington determined that assembly errors were the cause of firing malfunctions dating to 2006.

92. Remington, however, was unable to explain or determine why a significant number of other XMP rifles misfired for reasons unrelated to excess Loctite. It was clear that there were unknown problems with the XMP fire control that involved design, manufacture or assembly, and allowed XMP rifles to fire without the trigger being pulled.

93. Remington stopped production of XMP rifles in April 2009 and posted a Product Safety Warning and Recall campaign that proved to be generally ineffective especially for XMP owners residing in Michigan's Upper Peninsula.

94. Rebounding from the realization that an undetermined number of XMP fire control rifles produced from 2006 through 2014 were defective and not safe for intended use, Remington made numerous redesign changes and considerable improvement in assembly procedures including the use of a different class of Loctite specifically suited as a thread locker.

95. Remington's negligent manufacture and design of a defective fire control not fit for its intended ordinary purpose was a proximate cause of the wrongful death of Shellsea Lefebre.

96. Design and/or production defects included a safety lever that dangerously moved to the "F" position with 50% less effort than required for moving from "F" to "S", coating believed to be paint applied to parts of the fire control, blocker screw inserted crooked, as well as debris in the mechanism .

97.  Remington knew of at least 20,000 Walker rifles manufactured prior to 1975 were susceptible to inadvertent discharges when the safety lever was moved from the safe position to the fire position without the trigger being pulled. There were more incidents after 1975.

98.  Remington owed a duty to change to a fire control that guaranteed firing would not occur unless the trigger was actually pulled.

99. Remington breached its duty by selecting the XMP fire control when a "split trigger" fire control safety design was known, readably available, and more importantly proven to easily achieve the firearm industry standard that no firearm should be designed, manufactured or assembled that would allow firing without the trigger being pulled.

100.    On information and belief, Remington on or about 2009, if not before, undertook designing a rifle that would meet the industry standard of no fire without a trigger pull. This was the Model 783 which featured a Model 700-type safety lever plus a "split trigger" safety that guaranteed the rifle would not fire unless the trigger was pulled.

101.  Model 783 came to market on January 1, 2013. (**1st Amended Complaint Exhibit 10)**

102. Remington should have incorporated the "split trigger" safety instead of the dangerously unfit XMP fire control. Its failure to timely market a new bolt action rifle with a "spilt trigger" proximately caused Jose' Lefebre to unknowingly purchase a defectively dangerous Model 700 XMP rifle in 2011.

**WHEREFORE:** Plaintiff prays for judgment against Defendant for allowed compensatory damages in an amount exceeding $1,000,000 based on the verdict of the jury, together the post-verdict award of interest, costs and the award of reasonable attorney fees as allowed.

## COUNT III

## <u>BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY</u>

103. Plaintiff incorporates by reference each relevant paragraph of previous Counts including the Common Allegations as though fully restated herein.

104. Remington sale of the rifle to Lefebre included an implied warranty that the product was reasonably safe and fit for use and in a condition free of manufacturing related defects that could render the product unreliable and unreasonably dangerous to possess, handle or for humans to be in close proximity to the rifle.

105. Remington's implied warranty ran in favor of Shellsea Lefebre who was a resident in the home of her father, Jose' Lefebre.

106. Remington breached its implied warranty in the ways and manner previously alleged in the Common Allegations and Count I and 2.

107. As a matter of law. The Remington Model 700 purchased by Lefebre was defective and unfit for ordinary purpose because it would fire and did fire without the trigger being pulled.

108. Remington's breach of implied warranty was a proximate cause of the death of Shellsea Lefebre.

**WHEREFORE:** Plaintiff prays for judgment against Defendant for compensatory damages in an amount exceeding $1,000,000 based on the verdict of the jury, together the post-verdict award of interest, costs and reasonable attorney fees.

23

## COUNT IV

### BREACH OF EXPRESS WARRANTY

109. Plaintiff incorporates by reference each relevant paragraph including the Common Allegations and previous counts as though fully restated herein.

110. Remington sale of the rifle to Jose' included an express warranty that *"your Remington firearm will be free from defect in material and workmanship."*

111. Remington's express warranty ran in favor of Shellsea Lefebre who was a resident in the home of her father, Jose' Lefebre.

112. Remington breached its express warranty in the ways and manner previously alleged in the Common Allegations and previous paragraphs. The Model 700 purchased by Lefebre was defective and not fit for its ordinary purpose as a matter of law because it would allow and did allow firing without the trigger being pulled.

113. Remington's breach of express warranty was a proximate cause of the death of Shellsea Lefebre.

**WHEREFORE:** Plaintiff prays for judgment against Defendant for compensatory damages in an amount exceeding $1,000,000 based on the verdict of the jury, together the post-verdict award of interest, costs and reasonable attorney fees.

## COUNT VI

### VIOLATION OF MICHIGAN CONSUMER PROTECTION ACT

114. Plaintiff incorporates by reference each relevant paragraph of the Common Allegations and previous Counts as though fully restated herein.

115. Remington engaged in unfair and deceptive acts or practices in the conduct of its commerce in violation of M.C.L 445.903 (s) (Michigan Act) in that it *"failed to reveal a material fact*

*to the public in general and Jose' Lefebre in particular which tends to mislead or deceive*

*the consumer, and which fact or facts could not reasonably be known by the consumer.",*

and 445.903 (cc) in that it "*failed to reveal facts that are material to the transaction in light*

*of representation of fact made in a positive manner".*

116. The material facts are stated in the Common Allegations and previous counts and include:

- Failure to disclose the rifle could fire without trigger pull due to jarring or movement of the safety lever

- Failure to disclose defects in manufacture and assembly of the fire control

- Failure to disclose the rifle was not manufactured free of defects in material and workmanship.

117. Shellsea Lefebre as a member of the Jose' consumer's family was protected under the Michigan Act.

118. Remington's violation of the Michigan Act was a proximate cause of the wrongful death of Shellsea Lefebre.

**WHEREFORE:** Plaintiff prays for judgment against Defendant for compensatory damages in an amount exceeding $1,000,000 based on the verdict of the jury, together the post-verdict award of interest, costs and reasonable attorney fees.

## COUNT 6

## <u>VIOLATION OF MAGNUSON-MOSS ACT</u>

119. Plaintiff incorporates by reference each relevant paragraph of the Common Allegations and previous Counts as though fully restated herein.

120. The Magnuson-Moss Consumer Protection Products Liability Act, 15 U.S.C. § 2301, et seq. (Act) provides a private right of action to consumers and purchasers of consumer products

against retailers who, inter alia, fail to comply with the terms of an express or implied warranty.

121. Shellsea Lefebre was a protected "consumer" as defined in §2301(3) of the Act. The Lefebre rifle was a "consumer product" as defined in §2301 (5) of the Act.

122. Remington's Model 700 rifle with defective XMP fire control was manufactured and assembled with defects in material and workmanship as heretofore set forth in previous Counts. It was designed, manufactured and assembled in a manner that allowed it to intermittently fire without the trigger being pulled, all of which was not intended by Remington's design.

123. Remington's breach of implied and express warranty was a proximate cause of Shellsea's wrongful death.

124. Plaintiff and members of Shellsea's immediate family as previously identified have suffered damages as a proximate result of Remington's breach of implied and express warranty.

**WHEREFORE:** Plaintiff prays for judgment against Defendant for compensatory damages in an amount exceeding $1,000,000 based on the verdict of the jury, together with the post-verdict award of interest, costs and the award of reasonable attorney fees as allowed under the Act.

Dated this 13th Day of November, 2017

By: /s/ Leonard A. Siudara

## DEMAND FOR JURY TRIAL

Plaintiff, Michelle Marie Lefebre hereby restates the previously stated Demand for Trial by Jury.

By: /s/ Leonard A. Siudara

26