**IN THE UNTIED STATES DISTRICT COURT**

**FOR THE WESTERN DISTRICT OF MICHIGAN**

**NORTHERN DIVISION**

**MICHELLE MARIE LEFEBRE,**       **Case No.  2-17-cv-00152-GJQ-TPG**
**PERSONAL REPRESENTATIVE OF THE**
**ESTATE OF SHELLSEA BLAIR LEFEBRE-SCHIEL,**

        **Plaintiff,**

          **-Vs-**

**REMINGTON ARMS COMPANY, LLC.**

        **Defendant.**

_____/

### PLAINTIFF'S COMBINED RESPONSE AND BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS 1st AMENDED COMPLAINT

### Oral Argument Requested

Plaintiff by leave granted filed a Six-Count Wrongful Death Complaint:  Negligence and Gross Negligence for Failure to Promptly Warn of Highly Dangerous Product, Negligent Design/Manufacture, Breach of Implied Warranty of Merchantability, Breach of Express Warranty, Count Violation of Michigan Consumer Protection Act (M.C.L. 445,903(s) and Count VI: Violation of Magnuson-Moss Act (15 U.S.C. §2301). <u>Defendant has moved to dismiss under Rule 12 (B) (6) frivolously relying on 15 USC § 7901, et seq. The motion should be denied.</u>

### INTRODUCTION

Shellsea Lefebre, age 12, was killed on September 21, 2014 on Drummond Island while on a special DNR youth deer-hunting weekend with her father, Jose' Lefebre

(Lefebre). Nathan Ernst and his younger sister had joined in the camping hunt. Lefebre had been road hunting alone early that morning with his loaded Remington Model 700 rifle. Unknown to him, the rifle's safety lever caught on a phone charger cord as he put the rifle in the vehicle or later re-positioned it causing the safety lever to move forward from the 'Safe' position. Driving with a loaded Model 700 even with the safety in the 'Fire' position ordinarily would pose no real risk because Remington rifles are designed to fire only when the trigger is pulled. Notwithstanding the statute prohibiting transport of a loaded firearm, Lefebre could have safely driven all over the U.P and the rifle would not have fired as long as no one pulled the trigger. Lefebre's rifle, however, had been defectively manufactured, although he had no way of knowing it; it could fire without the trigger pulled.

Shellsea rode with her father later that morning seated in the right front seat of the Toyota four- door pickup. She and her father later met up with the other two. The group decided to drive to town for lunch. Ernst got into the right front seat with his sister behind. Shellsea got into the left rear seat. They drove the dirt road from camp for no more than five minutes before the rifle unexpectedly fired. The bullet stuck Shellsea killing her instantly. No one was touching the rifle when it suddenly discharged. No one had pulled the trigger.

Lefebre, a 100% disability-retired career Coast Guard chief petty officer, didn't know Michigan law prohibited the transportation of a loaded firearm in a vehicle. But more importantly, he was completely unaware the Model 700 rifle he purchased new in 2010 was dangerously unfit for ordinary use because the X-Mark Pro fire control (trigger mechanism) was negligently assembled so as to allow the rifle to fire without a trigger pull.

Remington began marketing XMP Model 700 rifles in May 2006. During assembly, a thread locking bonding agent (Loctite 660) by design was to be applied in a small amount

**inside** the blocker screw thread compartment to permanently set the screw to a pre-determined position. The blocker screw was an important component of the fire control's safety mechanism. The screw head butts up to the trigger block preventing forward trigger movement when the safety is on. Do to faulty assembly and lax quality control excess Loctite was applied **outside** the thread compartment and remained uncured causing the blocker screw head to intermittently stick to the trigger block pulling it forward and firing the rifle when the safety lever was moved forward from the 'Safe' to the 'Fire' position. (**1st Amend Comp Ex 5 & 6 –Doc # 29**) *are photos [1] of an* <u>*exemplar XMP fire control.*</u>) [2]

Information gathered indicates approximately 5,800 XMP rifles were returned to Remington from 2006 thru April 2014, many with owner complaints of non-trigger pull discharge. The rifles were superficially inspected and cleaned. But, the fire control blocker screw compartment was never closely inspected for signs of defective manufacture or assembly. Rather, the fire control in most instances was simply replaced with a new control and the rifle was returned at no cost with a note: *"Could not duplicate concern."*

Michael Breeze returned his new Model 700 in December 2010 with a video (**1st Amend Comp Ex *7* - Doc # 31** ) of his rifle firing when the safety lever was moved from 'Safe' to 'Fire' and also firing when the bolt handle was lifted. Although the Breeze video removed all doubt (or should have) that something was wrong with the XMP fire control, Remington did nothing for the next four years to attempt to seriously determine the cause.

---

[1] The open compartment window is visible on the side of the fire control. **Photo 6** shows the blocker screw butting up to the trigger block when the safety is in the *' Safe'* position.  **Photo 5** shows the head of the screw separated from the trigger block when the safety is in the 'Fire' position. The separation allows the trigger block to move forward when the finger trigger is pulled. The forward movement disengages the sear above allowing the firing pin to spring forward and strike the rear of the cartridge. There was no excess Loctite in fire control featured in these two photos. The excess Loctite on the defective fire controls was visible on inspection with light magnification. **1st Amen Comp Ex 4 – Doc #29)** is a drawing of typical fire control components.
[2] **1st Amen Comp Ex** is the identifier for Exhibits filed with the 1st Amended Complaint. **Brief Exhibit** identifies any exhibit filed with this Brief.

There was something very wrong with the XMP fire control because Remington had designed the rifle according to the industry standard that *"no rifle should fire unless the trigger is pulled."* There was also something even more wrong with Remington's wanton decision to stay silent and not warn owners of the danger when, as will be explained later, it would have been so easy to do. But that would involve a recall of 1,000,000+ rifles and would cost money. So, Remington did nothing and said nothing preferring not to give a damn if a defective rifle maimed or killed someone.

Remington's silence allowed a 2011 triple tragedy in North Carolina. A Model 700 owner was handling his rifle at home when it shockingly discharged without a trigger pull. The .308 caliber bullet went thru a window striking a young girl as she walked out of her home across the street. She died instantly. The bullet then exited and severely wounded the girl's sister walking behind. If that wasn't enough, the bullet then struck and severely injured an aunt walking behind the second girl. A lawsuit followed in 2013.

One would think this tragedy, others reported, the 2010 Michael Breeze video and a string of returned rifles over six years would have moved Remington to seriously investigate the XMP fire control. But that didn't happen. Derek Hawkins, a Remington engineer, was deposed in the triple tragedy case[3]. His answer to a straight forward question sheds some light on why Remington refused to admit the XMP fire control was defective.

*Q: Now, Remington people do not like to admit that the rifle fired without the trigger being pulled, do they?*
*A: No*

Remington's hard core seven-year denial of the obvious XMP defect was really a continuation of a profit protecting corporate culture that for 50 years despicably denied the

---

[3] McNeal vs Remington Arms Company. Dale Wills who appears for Remington in the instant case also appeared for Remington in that case. He was present during the Watkins' deposition and also the deposition of Dan Ronkainen, the XMP design engineer. He participated in both depositions.

inherent defect in the Walker fire control that was used exclusively in 1st generation Model 700 rifles that began manufacture in 1962 until replaced in 2006 with the XMP Model.

The Walker fire control had a quirky design feature found in no other modern fire control design that allowed field debris and firing residue to accumulate over time and then interfere with the critically important reset of trigger-sear engagement. This made the Walker rifle prone to firing when the safety was moved forward from 'Safe' to 'Fire'. And to make things more dangerous, Walker rifles (until 1989) could only be loaded or unloaded when the safety lever was moved forward to the Fire position. There were two dozen reported Walker related deaths over the years and 147 injury/death lawsuits.

One noteworthy Walker suit involved a South Dakota hunter killed when his Model 700 discharged when the safety was moved to the 'Fire' position. The surviving widow destroyed the rifle before she hired the right lawyer after by chance viewing *"Remington Under Fire"*, the 2010 CNBC documentary that exposed the defective Walker rifles. Remington argued plaintiff could not prove the 1971 manufactured rifle was in original condition. The district judge agreed and granted summary dismissal. The 8th Circuit reversed and in the course of the appeal used Remington's own records to indict the company.

O'Neal v Remington Arms Company, 803 F. 3rd 974 (8th Cir 2015)

*"Remington manufactured the Model 700 .243 caliber bolt-action rifle involved in this case in 1971. Remington used a trigger mechanism in its Model 700 rifles called the Walker trigger, named after the engineer who designed the mechanism. <u>Remington knows the Walker trigger can cause Model 700 rifles to fire a round when the safety lever is released from the safe position to the fire position, without the trigger being pulled.</u> The defect results from the manner in which two components of the trigger mechanism – the sear and the connector– interact with one another coupled with the lack of a physical attachment between the connector and the trigger itself. "*

*<u>Remington knew about this problem as early as 1979.</u> The record in this case includes the minutes from a Remington product safety subcommittee meeting dated January 2, 1979. Jt. App.at 624-28. The subcommittee minutes discuss the inspection procedures Remington*

5

*initiated on all bolt action rifles beginning in 1975, including the Model 700. Based in part upon the inspection of rifles returned to Remington for repairs, Remington acknowledged that Model 700 riles manufactured prior to 1975 can be "tricked into firing when the safety lever is released from the 'safe' position" without pulling the trigger.* <u>*Id.at 624. Remington estimated that at least 1% of the two million Model 700 rifles it had manufactured prior to 1975- or 20,000 rifles- would inadvertently fire merely by releasing the safety (i.e., moving the lever from the safe position to the fire position) without pulling the trigger. Id.*</u> *at 627. Remington decided against recalling the Model 700 rifles, though, because "the recall would have to gather 2,000,000 guns just to find 20,000 that are susceptible to this condition.* <u>*Id*</u> *at 627.*

<u>*"We agree with O'Neal that a rifle originally manufactured in this condition, which allows for the possibility of the rifle discharging without pulling the trigger, is defective and not fit for its ordinary purpose."*</u> *See Powell Report, Jt. App. At 586; cf. Lewy v. Remington Arms Co., 836 F. 2nd 1104, 1106-08 (8th Cir. 1988)(reviewing a products liability action against Remington which included a claim alleging this same defect in Model 700 rifles and noting "there was sufficient evidenced from which the jury could find that Remington knew the [Model 700 rifle] was dangerous").* <u>Emphasis Added</u>

Between 1991 and 2004, Remington's records revealed 3,273 customer complaints of Walker rifles firing without a trigger pull; an average of approximately 5 unintended firings per week for 13 years. (Count I at ¶ 48)

The sordid Walker trigger history (Id at ¶¶ 45-56) supports Plaintiff's claim for exemplary damages for Remington's corporate policy that thumbed its nose at Michigan law that required Jose' Lefebre and other Michigan XMP owners to be warned promptly of the rifle's latent life-threatening defect.

The history of Remington's continued production of dangerous Walker-equipped rifles and its steadfast denial of the inherent defect can be viewed in **Brief Exhibit 1**, the 2010 CNBC documentary: *"Remington Under Fire"*.

A class action suit in January 2013 was filed against Remington in the Western District of Missouri to force a recall of all Walker trigger bolt-action rifles. (Pollard v Remington Arms, et al, Case No. 13-CV-00086 (W.D. Missouri). Remington's defensive bubble burst

five months later when the District Judge denied a motion for summary judgment (Id at Doc. # 40) which guaranteed the class would be certified and recall relief granted.

Remington threw in the towel July 2014 deciding after some 50 years of stonewalling the issue to agree to recall all bolt-action rifles and replace the Walker fire trigger with the XMP.[4] But that meant Remington had to find out what was causing XMP rifles to misfire.

While caught up in the Pollard class action suit, Remington in March 2014 received a Model 700 XMP rifle from a Mr. Otto with a You Tube video (**1st Amend Comp - Ex 8 - Doc # 31)** showing the rifle firing when the safety was moved from S" to "F".

The Otto rifle and video were forwarded to a Remington engineer who began a serious investigation. He was able to duplicate the Otto misfire under certain conditions. He also duplicated the discharge in rifles Remington had in its inventory. A magnified inspection of the blocker screw compartment revealed excess Loctite 660 causing the screw to stick to the trigger block and fire the rifles when the safety lever was moved forward to 'Fire'.[5] It was time to act! But why the 2010 Michael Breeze video or the North Carolina triple tragedy and reported injury cases didn't prompt the same type of investigation remains unanswered.

Remington immediately shut down XMP rifle production. Changes were made to the XMP design, assembly and quality control. A Product Safety Warning and Notice of Recall (**1st Amend Comp Ex 9 - Doc # 29)** was created to warn unsuspecting users.

- *"Remington has determined that some Model 700 rifles with XMP triggers could under certain circumstances **unintentionally discharge**. A Remington investigation has determined that some XMP triggers might have excess bonding agent used in the assembly process.*

---

[4] Remington joined the Plaintiffs on July 2, 2014 filing a Joint Notice of Settlement informing the court that the parties had reached a nationwide class settlement.
[5] The investigation also revealed other issues that required changes to the design. Remington learned that the manufacturer of Loctite did not intend formula 660 to be used as a "thread locker". The correct thread locker was Loctite 263.

- ***STOP USING YOUR RIFLE".*** *Any unintended discharge has the potential to cause* ***injury or death.*** *Immediately cease use of recalled rifles and return them to Remington free of charge."*

Remington didn't mince words. But the blunt language proved useless because Remington never published the warning in a manner that would effectively get to XMP owners. The warning was published on the company web page no one looked at. The company thumbed its nose at Michigan law that clearly required <u>prompt</u> notice to purchasers. Whether or not Remington management or legal department knew of their duty to warn under the Comstock decision is unknown. Regardless, ignorance of the law is no excuse.

<u>Comstock v General Motors Corp., 358 Mich. 163, 177078, 99 N.W. 2nd 627,634-35</u> <u>(1959):</u> **(A)** affirmed case law requiring manufactures (at least in Michigan) to warn of defects known at the time of sale and **(B)** extended the rule by holding *"a like duty to give* <u>*prompt warning*</u> *exists when a latent defect which makes the product hazardous to life becomes known to the manufacturer shortly after the product has been put on the market."* (Emphasis added*)*

As the nation's oldest firearm dealer, Remington had to have known that its dealers were required by federal law to fill out an ATF Form 4473 for every over-the-counter firearm sale, file the Form with  ATF, and keep the Form for 20 years as required by 27 CFR 478.129. Remington needed only to request its dealers to return copies of the 4473's for all XMP Model 700 sales to get the name and address of every XMP purchaser and then directly send the Product Safety Warning to each by certified and regular US mail.

Remington had all of May, June, July, August and half of September to warn Lefebre in this fashion. His home address hadn't changed. Lefebre would have headed Remington's Product Safety Warning as he states in his evidentiary affidavit. **(Brief Exhibit 2)**

*"My home address today is the same as it was in 2010 when I bought the Model 700 rifle at Mackinaw Outfitters."*

*"I had no reason to believe when I bought the Model 700 rifle or at any time afterwards that it would fire without the trigger being pulled. I had never heard of such a thing. I had no knowledge before going to Drummond Island on September 20th that Remington had issued a recall warning that the Model 700 was defective, unsafe and could fire without anyone pulling the trigger."*

*"I can state positively that I would not have used the rifle or brought it to Drummond Island that weekend had I learned of Remington's Product Safety Warning and Notice of Recall. I would have sent the rifle back to the company for any servicing to make it safe for handling."*

*"I can state with absolute certainty that I didn't pull the trigger and neither did Nathan Ernst. Neither my hand nor his was touching the rifle when it fired as I was driving the truck."*

Counsel's diligence led to Sarah Grant, a former manager at the Mackinaw Outfitters store where Lefebre purchased the rifle that killed his daughter. Grant's affidavit **(Brief Exhibit 3)** has Lefebre's Form 4473 attached. **(Brief Exhibit 3-A)** She tells how simple it would have been for Remington to get Lefebre's contact data.

1. *I held a management position at Mackinaw Outfitters, a sporting goods retailer located in the Mackinaw Crossing shopping mall in Mackinaw City, MI. Mackinaw Outfitters opened for business in 2006 and the same year it became a licensed dealer for Remington Firearms.*

2. *Although Mackinaw Outfitters closed in December 2012, the Mackinaw Crossing Mall remained in operation. I stayed on in a management capacity at the on-site Mackinac Crossing office. Any mail sent to Mackinaw Outfitters in 2013 or 2014 would have been post office forwarded to our management office at the mall and would have come to my attention.*

3. *The important business records of Mackinaw Outfitters, including records documenting sales of Remington firearms, were retained and kept at the Mackinaw Crossing office under my administrative control until approximately October or November 2014 when those records were moved to Springfield, MO for storage. Included were the records of Remington firearm sales.*

4. *If a representative of Remington Arms had contacted Mackinaw Outfitters prior to its December 2012 closing explaining that it was recalling defective Model 700 rifles manufactured since 2006 and needed Mackinaw Outfitter's cooperation and copies of its firearm sales records to identify the name and address of Model 700 Michigan*

*purchasers, we would have been happy to comply with the request and help out. And it wouldn't have taken take very long to get the sales records to Remington.*

5. *Likewise, if Remington Arms had sent written notice to Mackinaw Outfitters between December 2012 and August 2014 or in any fashion had contacted our Mackinaw Crossing office making the same request, we would have complied and sent our records to Remington.*

Had the rifle not been defective, Shellsea Lefebre would have been a safe passenger in her father's vehicle regardless that the rifle was loaded. Remington's intended design called for the XMP rifle to fire only when the trigger was pulled. Had the rifle been built to specifications, Lefebre could have driven all day with the rifle loaded without any risk of firing and Shellsea today would be living. Had Remington promptly warned Lefebre as required by law and mailed its Product Safety Warning at any time during the 5 months preceding that tragic hunting weekend, Shellsea would also be living today.

Remington's failure to obey the law and warn is inexcusable. There are no questions of fact to cause denial of a planned Rule 56 motion for summary judgment of liability under Count I: Negligence and Gross Negligence for Failure to Promptly Warn.

## <u>COUNTERSTATEMENT OF THE GOVERNING LEGAL STANDARD</u>

In evaluating a motion to dismiss under FRCivP 12(b) (6), "all well-pleaded material allegations of the pleadings of the opposing party [here, plaintiff] must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment" as a matter of law. *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577*, 581-82 (6th Cir. 2007) (quoting* S. Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 479 F.2d 478 (6th Cir. 1973)). The Complaint must also be interpreted in the way most favorable to the plaintiff. *Saab Auto. AB v. General Motors Co.*, 770 F.3d 436, 440 (6th Cir. 2014).

To survive a Rule 12(b) (6) motion to dismiss, a plaintiff must provide "enough facts to state a claim [for] relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility when the complaint's factual content is sufficient to "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Probability is not required, but there must be more "than a sheer possibility that a defendant has acted unlawfully." *Id*. In analyzing the defendant's motion, the court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Logsdon v. Hains*, 492 F.3d 334, 340 (6th Cir. 2007).

## 15 USC § 7901

Remington refuses to recognize that 15 USC §7901 *et seq* protects manufacturers only where an injury was caused by a firearm that functioned as intended by the manufacturer's design. This clearly is not the case here.

The Congressional Findings cited in advance of the statute text to explain the history and purpose reveals the narrow congressional intent to bar lawsuits against manufacturers only when a firearm *"operate as designed and intended"*

§ 7901 (a) (3) *"Lawsuits have been commenced against manufacturers …. of firearms that operate as designed and intended which seek money damages caused by the misuse of firearms by third parties, including criminals."* (Emphasis added)

§7901 (a) (5) repeats the narrow scope of the Act. *"Businesses in the United States that are engaged in interstate …. commerce through the lawful design, manufacture … or sale to the public of firearms …are not and should not, be liable for the harm cause by those who*

*criminally or unlawfully misuse firearm products <u>that function as design and intended.</u>"*
(Emphasis added)

§7901 (a) (6) repeats the narrow scope of the Act. *"The possibility of imposing liability on an entire industry for **harm that is solely caused by others** is an abuse of the legal system."* (Emphasis added)

The narrow Congressional "Purpose" of the Act is apparent; two tests must be satisfied before a firearm manufacturer can be protected: (1) the "harm" done was solely caused by criminal or unlawful misuse of the firearm, and (2) the firearm functioned as designed and intended by the manufacturer.

§7901 (b) (1) *"To prohibit causes of action against manufacturers …of firearms or ammunition products …. for the **harm solely caused** by the criminal or unlawful misuse of firearm products … **when the product functions as designed and intended.**"* (Emphasis added)

In this case, the clear and convincing evidence shows beyond a reasonable doubt that the "harm" was not **"solely caused"** by the *"malum prohibitum"* act[6] of Lefebre ignorantly transporting a loaded firearm. The "harm" was **solely caused** by the discharge of a defective product that didn't function as intended by company design. The Hon. 8th Circuit got it right: *"A rifle originally manufactured in this condition which allows for the possibility of the rifle discharging without pulling the trigger, is defective and not fit for its ordinary purpose.* (Id. <u>O'Neal vs Remington)</u>

---

[6] An act made a crime merely because it is prohibited by statute, although the act is not necessarily immoral. A *"malum prohibitum"* offense is not a wrong which is prohibited, but something which is wrong *only* in the sense that it is against the law. Black's Law Dictionary (8th Ed. 2004)

## 1st AMENDED COMPLAINT ALLEGATIONS

The Remington Model 700 bolt action hunting rifle (rifle) equipped with an X-Mark Pro (XMP) fire control is the subject of this action. The rifle was negligently manufactured and assembled in a defective condition and purchased new by Jose' Lefebre in 2010[7] at a Remington distributor.  (1st Amended Complaint at ¶7)

All bolt action hunting rifles manufactured and sold by Remington after WWII were intended by design to discharge (fire) when the "trigger" is pulled and only when the "trigger" is pulled. (Id at ¶10) The XMP Model 700 was not designed to unintentionally discharge (fire) under any condition; especially not when the "safety" moved to the "F" (fire) position from either the "S" (Safe) or "null" positions or if the rifle should get bumped during handling when the safety was in the "F" (Fire) position.  (Id at ¶17)

The XMP Model 700 safety lever (**1st Amended Ex 2**) is located behind the bolt convenient for the shooters thumb to move the lever forward and back from "S" (safe) to "F" (fire). (Id at ¶ 15) The trigger is surrounded by a trigger guard (**1st Amended Ex 3**) designed to protect against inadvertent pull action. (Id at ¶18)

Lefebre and daughter Shellsea were hunting deer on Drummond Island the weekend of September 20, 2014 in the company of Nathan Ernst, a college student, and 12-year old sister Sarah. Shellsea Lefebre was issued a special youth DNR hunting license. (Id at ¶ 29) Lefebre was unaware he could not lawfully transport a loaded rifle in his vehicle, although he knew he could not shoot while inside his vehicle. (Id at ¶ 30)

Lefebre went looking for deer on the morning of September 21st. His vehicle was a four-door pickup. He loaded the Model 700 rifle and made sure the thumb safety was in the "safe" position. He then positioned the rifle with the buttstock at the passenger's floorboard and the

---

[7] The date of sale was erroneously stated to be 2011.The date of manufacture was April 2009.

barrel resting on the right-front passenger's window. (Id at ¶ 31) Shellsea joined her father later

that morning as a non-hunting passenger. She seated herself in the right-front passenger's seat.

The rifle with the buttstock on the floorboard and to the left of her left leg was repositioned so

the rifle barrel was pointed aft. (Id at ¶ 32)

Lefebre and daughter returned to camp and met Ernst and his sister. Later, around noon,

the four decided to drive to town for lunch. Ernst occupied the right front seat, Shellsea the left

rear behind her father with Ernst's sister in the right rear seat. (Id at ¶ 33)  The rifle was

positioned between Ernst's left leg and an interior vehicle panel and remained pointing rearward

as Lefebre drove along a dirt road heading to intersect the main road into town. The plan was to

stop near the main road intersection and unload and case the rifle. (Id at ¶ 34)

The rifle suddenly fired without anyone touching or pulling the trigger. The bullet struck

Shellsea killing her instantly.  (Id at ¶ 35) The fatal, unintended discharge was proximately

caused by undetected errors in Remington's assembly process (excess Loctite on the blocker

screw) that fouled the fire control making it vulnerable to unintentional discharge from a slight

jarring motion or movement of the safety lever.  (Id at ¶ 43)

The Chippewa Sheriff confirmed the rifle discharge was not caused by either Lefebre or

his front passenger pulling the trigger. (Id at ¶ 37)

Detective Postma at preliminary examination (**Brief Exhibit 4**) testified that neither

Lefebre nor Ernst (the front passenger) touched the rifle.

Q. Nathan Ernst – he was the 19-year old in the passenger side of the vehicle?
A. Yes
Q. And you interviewed him?
A. I did along with Deputy Hering, yes
Q. And as far as you are aware this 19-year old testified that he's unaware of what caused
this gun to trigger; is that fair?
A. Yes

Q. And just so we're clear, the reenactment that you conducted places that gun within the purview of the passenger side of the vehicle; is that fair?
A. That's correct.
Q. And there is a console that separates the two seats; is that fair?
A. That's correct.
Q. And is it your understanding that the gun triggered or went off while my client was driving the vehicle; is that fair?
A. The vehicle was in motion; you made a motion with both hands. I just testified that he told you he used the right hand and reached down.
Q. Okay. But just so we're clear he never testified he touched the gun; did he?
A. No.
Q. He said he never touched the gun in fact, didn't he?
A. Right
Q. Okay. In fact, the testimony you've gotten so far is that no one touched the gun to make it for {*sic*} off; isn't that fair? [8]
Q. Yep.

A close up photo of Lefebre's rifle (**1st Amended Ex 2**) shows the vertically protruding safety lever that easily could hook the charger cord during the positioning of the rifle causing the safety lever to move forward from "S" to "F" as the rifle was moved backward with stock resting on the floor.

Unbeknownst to Lefebre or the front passenger, the thumb safety lever apparently caught on a phone charger cord during the initial positioning of the rifle or later re-positioning. The entanglement caused the dangerously movable safety lever to easily travel to either into the "F" position or the "null position. The Loctite sticky blocker screw pulled the trigger block forward likely creating precipitous sear engagement which later became completely disengaged firing the rifle and killing the innocent passenger. Alternately, the sticky blocker screw pulled the trigger block from under the sear when the safety lever moved to the "F" position from either "S" or "null" position. One or the other of these probable malfunction scenarios caused Lefebre's rifle to discharge and kill his daughter. (Id at ¶ 44)

---

[8] "*For off*" was obviously meant to be "fire off"; most likely a transcription typo.

Detective Postma investigation report confirmed: *"a very recently severed charger cord with the point of severance in close proximity of the trigger" (and the safety lever). Severance of the tangled cord is thought to have occurred from the rifle's blast recoil that ripped the cord from the DC plug." (Id at ¶36)*

Six photos are attached to Lefebre's affidavit depicting the position of the rifle at the moment of discharge. **(Brief Exhibits 2A- 2F)**

Lefebre was initially prosecuted for two felonies. But after the extenuating circumstances were learned, the case was disposed on 2/13/17 with pleas of "no contest" to two high misdemeanors: Attempted transporting of a loaded firearm (MCL 750.227 C (A) and Allowing a Firearm under Control to Discharge and Kill (MCL 752.861(A). Under an Order Delaying Sentence **(Brief Exhibit 5)** the charges will be dismissed on 3/29/18.[9] But for want of a $100 license, no "crime" would have been committed.

Two Remington engineers confirm the product defect. Jim Ronkainen, the lead engineer who developed the XMP Model 700, gave candid deposition testimony in the North Carolina McNeal.

(T16-17)
*Q. We know now that a large number of XMP rifles manufactured between 2006 and April of 2014 were defectively manufactured, do you agree with that?*
*A. We found that there was Loctite between the blocker screw and the front of the trigger that, when it was in a liquid form, could be problematic in a certain temperature range, which caused us to do the recall that was put forth in April of last year.*
*Q. And what I'm asking you today is, in your opinion, that –that was mistake that happened in the manufacturing process, right, sir?*
*A. It was, yeah, the application of excess Loctite to the trigger assembly was not intended with the design.*

(T12)
*Q: The fact that the rifle will fire when it's under, quote, unquote, factory specifications without the trigger being pulled, that's a serious issue, isn't it, Mr. Ronkainen?*

---

[9] MCL.750.227c (Transporting a loaded firearm) was enacted in 1981.Today, 7% of Michigan citizens (500,000) are licensed to carry and transport a loaded firearm. The fee is $100.00.

*A. The gun is supposed to fire when the trigger's pulled, not when the safety is moved.*
*Q. Only when the trigger is pulled, yes, sir? Yes, sir?*
*A. Yes*

(T45-6)
The 2010 Breeze video was viewed during the deposition.
*Q. What do you think when you see that video?*
*A. The trigger assembly is behaving in an undesirable fashion.*
*Q. That's an extremely dangerous condition you just witnessed, isn't it.*
*A: Yes*

Derek Hawkins, the other Remington engineer, testified a day earlier: (T 59)

*Q. So any firearm that left the factory with this Loctite on the tip of the blocker screw or the engagement screw, in the time period we just discussed would have been defectively manufactured then, right?*
*A. Any X-Mark Pro that left the factory between 2006 to 2014 recall date that had liquid Loctite on the tip of the blocker was not to design specifications.*

## ARGUMENT

**Issue I: Under the cognizable facts of the instant case as stated in the 1st Amended Complaint, The Protection of Lawful Commerce in Arms Act (PLCAA), 15 U.S.C. §7901 *et seq*. does not apply so as to preclude this Action**

The express purpose of the PLCAA is *"To prohibit causes of action against manufacturers of firearms for the **harm solely caused** by the criminal or unlawful misuse of firearm products or ammunition products by others **when the product functioned as designed and intended."** 15 U.S.C. § 7901(b) (1) (2006).*

The "discharge" of the rifle and death of Shellsea Lefebre was not caused by transportation. Her father could have driven around Drummond Island all day and night with no harm possibly coming to anyone in or outside the vehicle so long as the rifle was functioning as Remington had designed and no one pulled the trigger. The death of Shellsea Lefebre was exclusively caused by the "discharge" of a defective Remington rifle that on September 21, 2014 was not functioning as Remington had intended by its design.

17

Statutes in derogation of the common law must be strictly construed, and will not be extended by implication to abrogate established rules of common law. Rusinek v Schultz Lumber Co., 411 Mich.502, 508 [309 N.W. 2d 163] (1981). The scope of the PLCAA must not be expanded beyond congress' clearly expressed purpose.

The uncontested facts of this case show the two-part test at of the PLCAA has not been met; (1) The death was not **solely caused** by the criminal or unlawful misuse of the firearm and (2) the firearm was not **functioning as designed and intended** by Remington. The PLCAA therefore does not apply as ground to dismiss Plaintiff's complaint.

**Issue II:  The Protection of Lawful Commerce in Arms Act (PLCAA), 15 U.S.C. §7901 _et seq_. does not preclude maintenance of this combined negligence and products liability action brought on behalf of the estate of an innocent victim on the cognizable facts alleged in the Complaint; the action may go forward by virtue of 15 U.S.C. §7903(5)(A)(v).**

One of the purposes of the PLCAA is "To prohibit causes of action against manufacturers .… of firearms or ammunition products .… for the harm solely caused by the criminal or unlawful misuse of firearm products or ammunition products by others when the product functioned as designed and intended." 15 U.S.C. § 7901(b)(1) (2006).  To that end, the PLCAA provides that "[a] qualified civil liability action may not be brought in any Federal or State court" (15 U.S.C. § 7902(a).

Congress defined a "qualified civil liability action" in 15 U.S.C. § 7903(5)(A) as:

a civil action or proceeding or an administrative proceeding brought by any
person against a manufacturer or seller of a qualified product, or a trade
association, for damages, punitive damages, injunctive or declaratory relief,
abatement, restitution, fines, or penalties, or other relief, resulting from the

criminal or unlawful misuse of a qualified product by the person or a third party * * *.

A "qualified product" means a firearm, or ammunition, or a component part of a firearm or ammunition, "that has been shipped or transported in interstate or foreign commerce." 15 U.S.C. § 7903(4) (2006).  Defendant Remington has no manufacturing facilities in Michigan, where its product was purchased, so there is no dispute that the rifle at issue traveled in interstate commerce.

Granting that the PLCAA narrowly immunizes firearms manufacturers from certain kinds of tort liability actions provided the harm is solely done by a firearm functioning as the manufacturer designed and intended, the statute contains a variety of exceptions, one of which has been correctly identified by defendant as key to this motion.  15 U.S.C. §7903(5)(A)(v) provides: that a qualified civil liability action shall not include:

> an action for death, physical injuries or property damage resulting directly from a defect in design or manufacture of the product, when used as intended or in a reasonably foreseeable manner, except that where the discharge of the product was caused by a volitional act that constituted a criminal offense, then such act shall be considered the sole proximate cause of any resulting death, personal injuries or property damage.

This lawsuit is an "action for death * * * resulting directly from of a defect in design or manufacture of the product, when used as intended or in a reasonably foreseeable manner", as defendant concedes (at least for motion purposes), and as the Complaint, accepted as true, asserts.  Defendant, however, contends that discharge of the rifle "was caused by a volitional act that constituted a criminal offense" and thus that such criminal act "shall be considered the sole proximate cause of any resulting death".  The issue thus framed concerns what really caused the rifle to fire. Was the discharge "caused by a volitional act that constituted a

criminal offense" or was it caused by Remington's admitted manufacturing defect that allowed the rifle to fire without the trigger being pulled?

The Complaint alleges that neither Lefebre nor his front passenger was touching the rifle when it fired. The detective sheriff confirmed Lefebre was driving the vehicle. The product defect that allowed the rifle to fire without a trigger pull has been confirmed by the deposition testimony of Remington engineers. The admitted defect clearly caused the discharge and not the act of transporting a loaded firearm. Remington's errant "volitional act" argument will nevertheless be discussed and refuted.

Ordinarily "[t]he proper analysis for determining the applicability of the PLCAA is two-fold," requiring first a determination whether the lawsuit in question is a "'qualified civil liability action'" and second an analysis whether, if it is, "any of the PLCAA's six exceptions to this definition apply." *Ryan v. Hughes-Ortiz*, 81 Mass.App.Ct. 90; 959 N.E.2d 1000, 1007 (2012).   Here, the first step has been surmounted and it is the second that concerns us now.

Black's Law Dictionary defines volition as: "(1) The ability to make a choice or determine something. (2) The act of making a choice or determining something. (3) The choice or determination that someone makes." Black's Law Dictionary 1605 (8th ed.2004).

Likewise, Webster's defines volition as: "the act of willing or choosing: the act of deciding (as on a course of action or an end to be striven for): the exercise of the will." Webster's Third New International Dictionary 2562 (1993). Webster's defines volitional as "of, relating to, or of the nature of volition: possessing or exercising volition." Webster's Third New International Dictionary 2562 (1993).  While transporting the rifle loaded was a criminal act, according to the Complaint, which is accepted as true, the discharge of the rifle

was accidental caused by the manufacturers admitted defect, which does not fit either the lay or law dictionary definition of "volitional act".

Defendant wants this Court to construe the statutory language as divorcing criminal act from consequences.  Under defendant's misreading of the statutory language, if there was anything criminal in relation to the firearm, it is immune from tort liability.  But Congress did not so provide; Congress very clearly legislated that the discharge of the firearm must not only be directly linked to the "volitional [criminal] act", the "harm" must be "solely caused" by criminal or unlawful misuse "when the product functioned as designed and intended."

In the only case with similar facts to address the application of 15 U.S.C. §7903(5)(A)(v)—discharge of a firearm, preceded by criminal activity which did not directly cause the discharge—the court rejected the manufacturer's recasting of the statutory language:

> In any event, there are triable issues of fact whether Chavez's lawsuit falls within the exception to the Act for product defect actions under the second step of the analysis. (15 U.S.C. § 7903(5)(A)(v).) Chavez focuses on his son's actions in firing the weapon and argues the discharge of the pistol was not caused by a volitional criminal act because his three-year-old son did not possess the requisite criminal intent (that, is knowledge of wrongfulness) when he pulled the trigger. (See Pen. Code, § 26 [children under age of 14 are not capable of committing a crime "in the absence of clear proof that at the time of committing the act charged against them, they knew its wrongfulness"].) Glock and Revolver Club dispute the exception applies, looking not to Collin's actions, but Chavez's. **They argue the discharge of the gun was caused by Chavez's volitional criminal acts of leaving the loaded pistol unsecured in his truck and placing Collin in the back seat of his truck, just a few feet away from the pistol, without being secured in a child car seat.**

> Unlike the definition of "a qualified civil liability action," which broadly includes any civil action "resulting from the criminal or unlawful misuse" of a firearm, **Congress** much more **narrowly defined the exclusion from excepted product defect suits to apply only if "the discharge of the product was caused by a volitional act that constituted a criminal offense. . . ." (15 U.S.C. § 7903(5)(A)(v).) By specifically linking the actual act of discharge to the criminal offense, as it did, we do not believe Congress intended, as Glock and**

> Revolver Club argue, to allow any unlawful act in the causal chain, however remote from the actual firing of the weapon, to defeat the exclusion. Indeed, to construe the exclusion as expansively as do Glock and Revolver Club, would effectively eliminate the exception for product design defect claims expressly provided by Congress.

*Chavez v. Glock, Inc*., __ Cal.Rptr.3d __, 207 Cal.App.4th 1283, 1317-1318 (2012)

(boldfaced emphasis supplied).

This result is also consistent with the judicially developed meaning of "volitional act", which is terminology arising in contexts unrelated to, and preceding, enactment of the PLCAA, but nonetheless involving firearms—such as contract interpretation and 4th Amendment jurisprudence.  Thus, in *Atlantic Casualty Insurance Co. v. Paradise Club*, 219 F.Supp.3d 938, 947 (W.D. Ark., 2016) the court held (boldfaced emphasis added):

> In the present case, the word "use" is included in the policy definition of "assault and/or battery." The Court is bound to the definition of the terms as defined in the policy and, therefore, the definition of "assault and/or battery" in the policy supersedes the common law or popular definitions of those words. However, the definition provided in the policy fails to explicitly state whether intent or volition is required on the part of the party causing the injury. That being said, the inclusion of the word "use" in the policy establishes that, in the very least, **some volitional action is required on the part of the party who causes the injury**. The word "use," in the "plain, ordinary, and popular sense," necessarily implies a "user" who has the ability to employ an object as a means to achieve some ends.
>
> Further, taking into account the context in which "use" appears, namely, a provision discussing "assault and/or battery" and **in conjunction with the terms "gun, firearm, knife, or weapon of any kind," it becomes clear that in order to fall under the exclusion not only must the injury be caused by a volitional act, but the user must be utilizing the gun as one would any weapon: as a means of intimidation or causing injury.** Such an interpretation is in accord with the terms in a "plain, ordinary, and popular sense" and is a "practical, reasonable, and fair interpretation consonant with the apparent object and intent of the parties in light of their general object and purpose."

To like effect is *Brice v. City of York*, 528 F.Supp.2d 504, 510-511 (M.D. PA, 2007):

> This court has previously addressed the volition necessary for an excessive force claim. In *Troublefield v. City of Harrisburg*, the court considered the excessive force claim of a plaintiff accidentally shot by the officer arresting him. See *id*. at

162. The officer was on patrol alone and had drawn his sidearm during the course of the arrest. See *id*. at 161-62. He handcuffed the plaintiff and was returning the weapon to its holster when it accidently fired, shooting the plaintiff in the leg. See *id*. at 162. The plaintiff argued that the accidental discharge of the weapon warranted Fourth Amendment liability because the plaintiff was seized by the application of handcuffs when the firearm discharged. *Id*. at 166. This court rejected the plaintiff's argument, holding: **"[S]ome nature of volitional act on the part of the state actor must cause the harm to plaintiff for a fourth amendment excessive force claim to sound. Negligence in pulling out a firearm or in re-holstering it is not sufficient in this court's view"** to hold a defendant liable for an excessive force violation. *Id*.

In *Clark v. Buchko*, 936 F. Supp. 212, 219-220 (NJ, 1996), the court reviewed a litany of

4th Amendment cases involving accidental (or at least unintentional) discharge of firearms,

concluding none presented a "volitional act" (boldfaced emphasis added):

> Following *Brower*, at least three courts have applied *Brower* in the context of accidental shootings of suspects in the course of an arrest or seizure. *Troublefield v. City of Harrisburg*, 789 F.Supp. 160 (M.D.Pa.1992), aff'd 980 F.2d 724 (3d Cir. 1992); *Matthews v. City of Atlanta*, 699 F.Supp. 1552 (N.D.Ga.1988); *Glasco v. Ballard*, 768 F.Supp. 176 (E.D.Va.1991). Additionally, at least one court prior to *Brower* addressed whether an accidental shooting could constitute a seizure. *Dodd v. City of Norwich*, 827 F.2d 1 (2d Cir. 1987);

> In *Matthews, supra*, a police officer was in the process of arresting the decedent when his gun accidentally discharged. The accident occurred when the truck operated by the decedent "unexpectedly lurched forward causing contact with the truck's door and the officer's hand or weapon." *Matthews v. City of Atlanta*, 699 F.Supp. 1552, 1555 (N.D.Ga.1988). In *Glasco, supra*, the police officer pulled over a shoplifting suspect. As the officer exited his vehicle and drew his weapon, his police car began to roll. In order to stop the vehicle, the officer leaned back into the car, put his foot on the brake and placed the car in park. In the process, the gun accidentally discharged. *Glasco v. Ballard*, 768 F.Supp. 176, 177 (E.D.Va.1991). In *Dodd, supra*, the decedent, an apprehended burglar, was inadvertently shot "during a struggle initiated by him in an attempt to disarm the arresting officer and after he had apparently surrendered." *Dodd v. City of Norwich*, 827 F.2d 1, 7 (2d Cir. 1987). In *Troublefield, supra*, the plaintiff had just been handcuffed when the officer began to re-holster his gun. *Troublefield v. City of Harrisburg*, 789 F. Supp. 160, 162 (M.D.Pa.1992), aff'd 980 F.2d 724 (3d Cir. 1992). As he did so, the plaintiff was accidentally shot.

> In all four cases, the courts concluded that the plaintiffs could not maintain Fourth Amendment claims against the officers because the officers lacked intent to seize the victims by firing the guns. Further, **the courts were unpersuaded by**

**the argument made by the plaintiffs in the instant case that once a seizure had occurred, all claims for excessive use of force, whether volitional or not, are governed by the Fourth Amendment "reasonableness" standard**. As the court in *Troublefield* explained:

> The court can see no principled reason for applying what is essentially a negligence standard (i.e. "reasonableness") to an officer's conduct in a situation where a suspect is accidentally shot while in the process of being apprehended (only moments after the initial confrontation, one may surmise), but in holding that no fourth amendment "seizure" is present where an officer is chasing a suspect and his gun accidentally discharges. See *Dodd v. City of Norwich*, 827 F.2d 1, 7-8 (2d Cir. 1987) (discussing place of negligence concepts in fourth amendment jurisprudence). If Salada had intended to shoot, he would have upped the ante and, in effect, brought about a second seizure of Troublefield. This is, as recognized by many of the cases discussed above, a fine distinction.

*Id*. at 166.

Application of those cases compels this court to dismiss plaintiffs' fourth amendment claims. Although plaintiffs acknowledge *Troublefield*, the plaintiffs' attempt to distinguish the case is unpersuasive. **The simple fact of this case is that Clark was not intentionally shot**. Plaintiffs attempt to distinguish *Troublefield* by citing their expert, who suggests that Buchko acted with "recklessness" or "gross negligence." Terms aside, **plaintiffs acknowledge that Buchko did not commit a volitional act in firing the gun**. As the Supreme Court explained in *Brower*, no seizure occurs unless "there is a governmental termination of freedom of movement through **means intentionally applied**." *Brower v. Inyo County*, 489 U.S. 593, 597, 109 S.Ct. 1378, 1381, 103 L.Ed.2d 628 (1988). Accordingly, plaintiffs cannot maintain a Fourth Amendment claim.

In contrast, in an unpublished habeas corpus decision, the Sixth Circuit had no difficulty finding a "volitional act" where the party discharging a firearm actually pulled the trigger deliberately. In *Henry v. Martin*, 105 Fed. Appx. 786, 791-792 (6th Cir. 2004), the Court quoted approvingly from the state appellate court's decision (boldfaced emphasis added):

The district court succinctly and persuasively stated why the Court of Appeals' conclusion with regards to prejudice was objectively reasonable:

> **[T]he evidence that petitioner intentionally discharged the firearm was exceedingly strong**, if not overwhelming. The evidence showed that **petitioner** argued with his wife who accused him of having no self-control, then announced that he would "show her some self-control," or words to that effect, and **took a handgun from the dresser drawer.**

**These were intentional acts indicating purposeful action in response to a perceived insult or slight. Next, petitioner put a clip or magazine into the gun, another intentional act. Petitioner testified that he normally stored the gun with the safety on. If this was the case on the day of the incident, it would have required another intentional, volitional act to disengage the safety before the gun could be fired. Petitioner then fired the gun.** Michigan State Police Sergeant James Dowling testified that he tested the trigger of the [gun] used in the incident and found that it took between nine and ten pounds of pressure on the trigger to cause the gun to fire. This is a substantial amount of pressure on the trigger, again suggesting an intentional act. It is also noteworthy that petitioner pointed the gun at a wall before firing it. This also indicates intentional action, where petitioner sought to make a point, however recklessly and foolishly, but did not intend to injure his wife or child, both of whom were present when he pointed the gun at the wall and fired it. Further, ... there was no testimony that petitioner staggered or stumbled or fell or bumped into anything when the gun discharged.

Under the facts pleaded in the Complaint, the accidental discharge of the defective rifle manufactured by defendant, at a time when no person's finger was on the trigger, and no person's hand was on the gun, was not a "volitional act" directly connected to criminal activity.   Accordingly, 15 U.S.C. §7903(5)(A)(v)'s exception to denial of immunity for product liability claims is not applicable, and the motion to dismiss must be denied.

Dated this 29th Day of January, 2018

Respectfully submitted:

/s/ Leonard A. Siudara
Attorney for Plaintiff, (P20542)
5865 Andover Ct.
Troy, MI 48098
248-417-7300
budatlaw@msn.com